**In re Francinee JAMES, Appellant.**

No. 84–1752.

District of Columbia Court of Appeals.

Argued Dec. 4, 1985.

Decided April 4, 1986.

Laurie B. Davis, Public Defender Service, Washington, D.C., with whom James Klein and Mark Carlin, Public Defender Service, were on brief, for appellant.

Alan Cohen, with whom Barbara J. Matthews, Staff Atty., Saint Elizabeths Hosp., Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on brief, for appellee.

Before BELSON, TERRY and ROGERS, Associate Judges.

ROGERS, Associate Judge:

The issue in this appeal is whether the trial court must make an explicit finding that inpatient treatment is the least restrictive alternative before revoking a patient's outpatient commitment pursuant to the District of Columbia Hospitalization of the Mentally Ill Act, D.C.Code § 21–501 et seq. (1981). Because the revocation directly affects a patient's conditional liberty interest, we hold a finding is required. Accordingly, since the trial court did not find indefinite inpatient treatment was the least restrictive alternative, and the record is inconclusive, we reverse.

## I

On November 23, 1983, Francinee James, age 33, was committed to Saint Elizabeths Hospital (Hospital) on an outpatient basis. D.C.Code § 21–545(b) (1981). As a condition of her commitment she was "to participate in an outpatient course of treatment under the supervision of [the Hospital].…" The order of commitment provided if she "fail[ed] to continue to participate in the prescribed course of treatment, or if her condition deteriorates so that rehospitalization is required," the Hospital could temporarily return her to inpatient status for a maximum of five days; to detain her at the Hospital for additional time, the Hospital must petition the court for revocation of her outpatient status. For approximately five months James complied with the treatment plan, visiting the Hospital clinic daily and taking her medication. In March 1984, she was rehospitalized for two weeks, and thereafter complied with the treatment plan on a sporadic basis. Her last visit to the clinic was on April 30, 1984. After unsuccessful efforts by Hospital staff to get James to return as an inpatient, the Hospital filed a petition on August 10, 1984, to take her into temporary custody on

the grounds she was not following the treatment plan and, according to her father, had threatened a METRO employee. D.C.Code § 21–592 (1981).

James was returned to the Hospital by the police on November 24, 1984. On November 27 the court determined, *ex parte*, there was probable cause to believe James had not complied with her treatment program and her mental condition had deteriorated, and ordered her temporary detention at the Hospital. The next day the Hospital filed a petition to revoke her outpatient commitment. *See* D.C.Code § 21–545(b). Attached to the petition was a letter from Dr. Rothman, a Hospital psychiatrist, who diagnosed James as suffering from schizophrenia, paranoid type, and grossly delusional on the day of admission.

On December 12, 1984, James appeared with counsel for a hearing on the Hospital's petition to revoke her outpatient commitment. Prior to receiving testimony, the trial judge explained to James that she could remain voluntarily as a Hospital inpatient, returning to outpatient care if she and the doctors agreed her condition had "stabilized," but if she declined to return voluntarily, then the court would determine, after a hearing, whether she had violated the conditions of her previous release. The judge advised, "Now, if I find that [is] so, all I can do is send you back without any conditions of any kind." James said she wanted a hearing. The judge proceeded to receive testimony from Dr. Greeley, a psychiatrist who had known James since her first admission to the Hospital in 1982 and on whose ward appellant had been a patient several times thereafter, and from James.

Dr. Greeley, an expert in psychiatry, treatment and diagnosis, testified that in her opinion James was suffering from chronic paranoid schizophrenia, and inpatient treatment was necessary because

James had failed to follow her treatment plan, her mental condition had deteriorated, and she had a history of violent behavior prior to her 1983 commitment. Relying on the Hospital's records, the doctor described James' behavior since her commitment in 1983. The doctor described James' behavior after she began missing clinic appointments in the spring of 1984, referring to her laughing inappropriately and staring into space when she came to the clinic. The doctor also referred to telephone calls from James' family expressing concern about her mental condition, and advising that a friend with whom James was living in Maryland did not want her to remain. The doctor reported James had lived at a motel in Silver Spring, Maryland, but refused to speak with Hospital staff about returning to the Hospital. Subsequently she was apparently evicted from the motel, slept in parks during the summer, and traveled around the country and in Mexico. In late November James' grandmother called the Hospital to ask what she should do since James was at her house being "extremely disruptive, hostile, combative"; the grandmother was told to call the police. That night James slept on her grandmother's porch. Dr. Greeley could provide no further details of James' behavior during the three days from the grandmother's call to James' return to the Hospital on November 24. When James was returned to the Hospital, the doctor found her to be delusional, believing she had graduated from Harvard and worked for the Central Intelligence Agency, and noted that her personal appearance and hygiene had deteriorated. James also exhibited "illogical" and "incoherent" thought processes, claiming "she couldn't be in doors [sic] because PEPCO [was] running electric currents through her body which were causing her great pain."

James testified she realized she had not complied with her treatment plan,[1] but asserted she was now willing to comply fully

---

1. Before being sworn as a witness, James had claimed she was unaware of the terms of her outpatient commitment, having never received a copy of the 1983 commitment order. She also claimed she had notified a psychiatrist at the Hospital of her vacation plans and asked that he advise the clinic.

with any treatment prescribed by the Hospital. She maintained she was willing to take the newly prescribed medication because, unlike the prior medication, it did not sedate her and allowed her to function. On cross-examination she explained the electrical currents running through her body were caused by an electrical muscle stimulation device used in physical therapy for her back injury.[2] She declined to say whether or not she worked for the CIA, claiming she was not at liberty to do so and had advised the Hospital it could call the agency to try to confirm her employment.

Following argument of counsel, the trial judge defined the issue before him as "whether or not revocation of outpatient treatment should be revoked, and that's all." The judge observed if this were an original commitment proceeding, James might prevail on her request for continued outpatient treatment. However, while finding Dr. Greeley's testimony credible, the judge questioned the sincerity of parts of James' testimony. He also observed that if James entered the Hospital as a voluntary inpatient, she could probably be out in a very short time, because she was "rather hep. She knows what the story is." The judge noted James had avoided the jurisdiction of the court, by living in Maryland and traveling, and had been "in pretty bad shape" when she was returned to the Hospital. Finding James had violated the conditions of her outpatient treatment, the judge ordered her committed to the Hospital as an inpatient, and denied counsel's request he take the revocation petition under advisement in order to allow James to remain voluntarily as an inpatient at the Hospital.

## II

In considering a petition for involuntary commitment under the District of Columbia Hospitalization of the Mentally Ill Act (Act), the trial court may order indefinite hospitalization or "any other alternative course of treatment which the Court believes will be in the best interests of the person or of the public." D.C.Code § 21–545(b) (1981). In the leading case of *Lake v. Cameron*, 124 U.S.App.D.C. 264, 364 F.2d 657 (1966) (en banc), the United States Court of Appeals for the District of Columbia Circuit construed the Act to require the trial court to inquire into such "other alternative courses of treatment." *Id.* at 268, 364 F.2d at 661. This conclusion followed from the court's view "[d]eprivations of liberty solely because of danger to the ill person themselves [sic] should not go beyond what is necessary for their protection." *Id.* at 267, 364 F.2d at 660 (footnote omitted). *See* Super.Ct.M.H.Rule 6 (court may receive evidence concerning alternative dispositions less restrictive than commitment). Once the court orders a patient's commitment, the Hospital is obligated to follow the least restrictive form of treatment. *In re Richardson*, 481 A.2d 473, 480 (D.C.1984).[3]

A patient on outpatient status has a conditional liberty interest in remaining an outpatient, and is, therefore, entitled to due process safeguards when the court is considering whether inpatient status involving indefinite involuntary·hospitalization is required because of the patient's deteriorated mental state or dangerousness. *In re Mills*, 467 A.2d 971, 975 (D.C.1983). In *Mills*, this court rejected the notion the presumption of mental illness and dangerousness established by the original commitment allowed a court to revoke an outpatient commitment when a patient has failed to comply with the outpatient treatment plan. We emphasized due process had been afforded in revoking an outpatient

---

**2.** The Hospital record indicated James had suffered a physical injury in 1975 when she had worked for METRO.

**3.** D.C.Code § 21–546 (1981 and 1985 Supp.) provides a patient has a right to obtain re-examination of his or her mental condition as often as every six months and to petition the court for an order directing release if one or more of the examining physicians concluded the patient is no longer mentally ill to the extent to constitute a danger to self or others if not hospitalized.

commitment because, in part, the government had the burden of establishing the need for inpatient treatment and the court made new findings of mental illness and dangerousness, and "specifically concluded that hospitalization was the only appropriate treatment alternative." *Id.* at 976 (citing D.C.Code § 21–546 (1981)). We perceive no rational basis for concluding the trial court's duty to inquire into the least restrictive alternative ceases when the Hospital seeks to revoke an outpatient commitment. Accordingly, we hold the trial court's decision to revoke an outpatient commitment pursuant to D.C.Code § 21–545(b) must abide by the least restrictive treatment principle, and be supported by an explicit finding that the proposed treatment is the least restrictive alternative.

The record supports the trial judge's findings that James failed to comply with her outpatient treatment plan and her mental condition had deteriorated as a result. *See Mills, supra,* 467 A.2d at 974. Assuming for the moment there was evidence on which the trial judge could also find appellant was likely to be dangerous to herself or others, the record reveals the judge did not find inpatient commitment was the least restrictive treatment alternative, a necessary predicate to granting the revocation petition. Other than a conclusory finding James was likely, because of her deteriorated mental condition, to injure herself or others if not hospitalized, the trial judge found only that her "psychiatric condition has deteriorated as evidenced by her disruptive, hostile, and combative behavior while living in her grandmother's home just prior to hospitalization."

A revocation of outpatient commitment based solely upon a patient's failure to comply with the prescribed course of outpatient treatment, without reliable evidence in the record that the patient is likely to be dangerous as a result of her mental illness, would violate the Act. *See* D.C.Code §§ 21–545(b), 547; *see also supra* note 3. Further, James' treatment history since 1983 suggests that revocation of her outpatient commitment would be impermissibly punitive in the absence of a finding that inpatient commitment was the least restrictive alternative. The doctor did not explain why only inpatient commitment would suffice in 1985 when the Hospital, and the court, had previously concluded James' behavior could be treated on an outpatient basis.[4] Nor was the doctor asked whether, as an alternative to inpatient commitment, James would have remained voluntarily at the Hospital for a sufficient time to assure that her mental condition would not deteriorate and make her likely to injure herself or others. When the judge inquired whether the doctor believed James would take her medication, the doctor replied James would not do so for any length of time. But it is unclear whether the doctor thought James would remain voluntarily at the Hospital for a sufficient period of time to stabilize her mental condition.

■ Although the Hospital did not have the burden to show James had engaged in recent overt acts of violence in order to prove dangerousness, *In re Bumper,* 441 A.2d 975, 978 (D.C.1982); *In re Snowden,* 423 A.2d 188, 191 (D.C.1980), mere conclusionary statements were insufficient. *See Addington v. Texas,* 441 U.S. 418, 420–21 (1979); *cf. In re Barnard,* 147 U.S.App. D.C. 302, 307, 455 F.2d 1370, 1375 (1971) (emergency commitment under D.C.Code § 21–525). Dr. Greeley was entitled as an expert witness to rely on facts reported by others as the basis for her opinion, *Jenkins v. United States,* 113 U.S.App.D.C. 300,

4. Dr. Greeley testified the Hospital records indicated James' first admission to the hospital was precipitated by her trying to strangle a neighbor with a rope because she believed that the neighbor was somehow pouring chemcicals [sic] into her apartment. She also threw stones on one occasion at somebody in the phone booth outside of her apartment because she believed that that was her personal phone booth and he was using it and was not supposed to be there.

On another occasion she attacked one of her neighbors with a tree limb. There is also a report that she broke someone's leg.

Dr. Greeley admitted she was not positive about the last incident.

304, 307 F.2d 637, 641 (1962); *Blunt v. United States,* 100 U.S.App.D.C. 266, 275, 244 F.2d 355, 364 (1957), but she was unable to provide any details about the incident at the grandmother's house, and could provide no information about the circumstances which caused James' mother to have her returned to the Hospital several days later. The doctor's references to James' past violent behavior did not always specify when these incidents occurred, and from our review of the record they appear to have occurred prior to the grandmother's telephone call. The doctor was never asked whether there was any linkage between James' current deteriorated mental condition and the likelihood she would cause or threaten to cause the type of danger, or worse, which had precipitated her commitment in 1983. James was not asked about her conduct at her grandmother's, and neither James' parents nor her grandmother testified; nor did the Hospital present their sworn affidavits in support of its petition. Accordingly, in the absence of an indication in the record that the judge recognized his obligation to determine whether revocation of James' outpatient commitment was the least restrictive treatment alternative, we decline to construe the Act to permit the trial judge to fulfill his duty on the basis of conclusory medical and imprecise factual information.

If James were still hospitalized, we would remand with directions to reopen the hearing, if necessary, and to make further findings. Since she is now on convalescent leave,[5] we deem it appropriate to vacate the order of indefinite inpatient commitment. *See Friend, supra,* 128 U.S.App.D.C. at 326, 388 F.2d at 582. This action does not affect the validity of James' 1983 outpatient commitment. The Hospital is, of course, authorized under Subchapter III of the Act, D.C.Code § 21–521, to take her into immediate custody if it should determine, in accordance with *Richardson, supra,* 481 A.2d at 480–81, that action is required.[6]

*Reversed.*

---

5. At oral argument the parties advised appellant was released on convalescent leave in February 1985. This does not render the appeal moot. *See Friend v. United States,* 128 U.S.App.D.C. 323, 388 F.2d 579 (1967); *see also In re Morris,* 482 A.2d 369, 371–72 (D.C.1984) and cases cited therein.

6. In view of our disposition we need not reach James' contentions that her right to confront witnesses was violated, and the doctor improperly relied on notes made by the Hospital staff.