**In the Matter of Gwendolyn
STOKES, Appellant.**

No. 85–1249.

District of Columbia Court of Appeals.

Argued Jan. 21, 1987.
Decided July 13, 1988.

Barbara J. Matthews, Office of Legal Advisor, Saint Elizabeths Hosp., with whom Joseph E. diGenova, U.S. Atty. at the time the brief was filed, and Michael W. Farrell, Asst. U.S. Atty., were on the brief, for appellee.

Before MACK, BELSON, and ROGERS, Associate Judges.

MACK, Associate Judge:

Gwendolyn Stokes was initially committed to Saint Elizabeths Hospital as an outpatient under the District of Columbia Hospitalization of the Mentally Ill Act, D.C. Code § 21–545 (b) (1981) (part of the "Ervin Act"). Subsequently, her outpatient status was revoked. On appeal, she contends the trial court denied her due process when it revoked her outpatient commitment without explicitly finding that indeterminate inpatient commitment was the least restrictive form of treatment. She also argues that the evidence of her mental illness and dangerousness was insufficient. We reverse.[1]

## I

Appellant was taken to Saint Elizabeths Hospital as an emergency involuntary patient under the Ervin Act. Pursuant to a petition for judicial hospitalization, D.C. Code § 21–541 (1981 & 1987 Supp.), the Commission on Mental Health conducted a hearing and concluded that Ms. Stokes was mentally ill and likely to injure herself or others. It recommended that she be committed as an outpatient. Based on a review of the record, the trial court, per Judge Sylvia Bacon, found that Ms. Stokes did not need inpatient treatment and that outpatient treatment was in the interests of Ms. Stokes and the community. The trial court entered an order of outpatient commitment pursuant to D.C. Code § 21–545(b) on March 13, 1985.

Ms. Stokes was returned to the hospital on August 7, 1985. The hospital petitioned to revoke Ms. Stokes' status as an outpa-

David L. Norman, Public Defender Service, with whom James Klein, Public Defender Service, Jennifer Lyman, Public Defender Service, and Laurie B. Davis, Public Defender Service, were on the brief, for appellant.

1. Since the time this appeal was noted, Ms. Stokes has been placed in the community at the hospital's discretion on convalescent leave. That placement does not render this appeal moot. *See In re James,* 507 A.2d 155, 159 (D.C. 1986).

tient and on September 4, 1985, Judge Warren King held a hearing on the question whether Ms. Stokes' outpatient commitment should be revoked. Following testimony by one witness and the arguments of counsel, the trial court granted the hospital's petition for complete revocation.

The only witness who appeared against Ms. Stokes was the hospital psychiatrist, Dr. Barbara Basta. No lay witnesses were produced, nor were sworn affidavits introduced. At the hearing, Dr. Basta opined that Ms. Stokes suffered from a bipolar disorder and mixed substance abuse. She stated that Ms. Stokes had a long history of drug use and psychiatric admissions.

Over a continuing hearsay objection, Dr. Basta also gave an account of Ms. Stokes' conduct since the time of her commitment. She testified that Ms. Stokes returned to the hospital on April 1, 1985 exhibiting symptoms of phencyclidine (PCP) intoxication. The doctor did not state whether Ms. Stokes engaged in any dangerous behavior, nor whether she showed symptoms of mental illness independent of the drug intoxication. She described how, on April 10, 1985, Ms. Stokes was readmitted to the hospital with "the same history of violent, aggressive behavior, distractive at home, threatening, hallucinating, delusional." The doctor did not offer factual details underlying her description, nor did she note whether the alleged conduct was the product of drug abuse or mental illness. The doctor testified to the fact that Ms. Stokes had had several brief readmissions, and that each time Ms. Stokes "needed seclusion for extremely violent and threatening behavior, very difficult to handle at that time." The doctor did not attach any dates to those admissions, nor did she indicate how many they were in number. No details with regard to the "dangerous behavior" Ms. Stokes had exhibited were provided, and the doctor did not associate the behavior with anything other than PCP use.

Dr. Basta also gave an account of Ms. Stokes' last return to the hospital on August 6, 1985, reciting a report by a hospital staff member based on a conversation with Ms. Stokes' mother. Dr. Basta said that the report showed that Ms. Stokes "was semi-delusional, became assaultive towards the mother, threatening, aggressive, hostile." Dr. Basta also mentioned the description of the admitting psychiatrist that Ms. Stokes was "agitated, uncooperative, hostile, threatening at that time." Dr. Basta stated that the next day Ms. Stokes was a problem for the staff because she was "dancing, the way that generally is known as inviting men." Other than the dancing incident, the doctor provided no details of Ms. Stokes' allegedly dangerous conduct on the August 6th admission; nor did she associate it with a mental illness. The doctor also testified that Ms. Stokes' behavior between March and August 1985 was not appreciably different from the behavior that she historically had exhibited and that had been taken into account in her original outpatient commitment, except that her returns to the hospital were spaced closer together.

Dr. Basta noted that, upon Ms. Stokes' last return in August, the doctor switched her medication from Haldol to Lithium and Navane. Ms. Stokes improved markedly and rapidly, and the doctor said she believed her prognosis was excellent on the new medication. However, the doctor stated that she did not believe that Ms. Stokes would continue to take medication on her own. Dr. Basta also described a new "dual diagnosis" program, which was specifically tailored to individuals who have a mental illness and are substance abusers, such as Ms. Stokes was alleged to be. No program of its kind had been made available to Ms. Stokes prior to her August readmission (specifically, the program was only established on July 29, 1985). Ms. Stokes had been participating in the program for only three weeks, yet the doctor believed her insight into her drug use had already become better than it was when she was originally committed. However, in spite of Ms. Stokes' improvement, Dr. Basta rejected the alternative of community residence with daily participation in the new program.

After the hospital rested, Ms. Stokes testified. She stated that she wanted to devel-

op the capacity to refrain from using street drugs, and that she found the dual diagnosis program to have helped her already. Ms. Stokes testified she would continue attending the program, as well as continue taking medication and therapy at the hospital on a daily basis as an outpatient.[2]

The court found that Ms. Stokes "would be a serious problem if returned to the community. I have no confidence that she will take her medication. I have no confidence that she will stay away from dangerous drugs." In a written order signed the next day, the trial judge supplemented his findings by noting that Ms. Stokes suffers from a mental illness and because of such was likely to injure herself or others if not hospitalized; that her condition had deteriorated as evidenced by recent threatening, assaultive, and delusional behavior; that she had frequently abused PCP; that she had been returned to the hospital at least five times since March 1985 due to deterioration in her condition; that she began in the new dual diagnosis program in August 1985 and her motivation to avoid illicit drugs had already increased; but her condition remained unstable and inpatient hospitalization was necessary. Neither orally, nor in writing, did the trial court explicitly address or reject alternatives less restrictive than indefinite inpatient commitment.

## II

In *In re James, supra* note 1, this court found that in considering a hospital petition for revocation, the trial court has the obligation to satisfy itself that no alternative less restrictive than inpatient treatment would be appropriate. Specifically, the court held that "the trial court's decision to revoke an outpatient commitment pursuant to D.C. Code § 21–545(b) must abide by the least restrictive treatment principle, *and be supported by an explicit finding that the proposed treatment is the least restrictive alternative.*" 507 A.2d at 158 (emphasis added).

■ It is argued that the *James* decision imposes a new duty on trial courts and, accordingly, under the "clear break" doctrine (*see United States v. Johnson,* 457 U.S. 537, 549–56, 102 S.Ct. 2579, 2587, 73 L.Ed.2d 202 (1982)) should not be applied retroactively. However, the Supreme Court has since rejected the "clear break" analysis for cases pending on direct review. *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). In *Griffth,* the Court held that a new rule for the conduct of criminal prosecutions applies retroactively to all cases pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a "clear break" with the past. The instant case was pending on direct review at the time that James was decided.[3] Thus, by analogy, we apply to the instant case the new rule in James that the trial court must make an explicit finding that the proposed treatment is the least restrictive treatment alternative.[4] Because the trial court made no *explicit finding* here, we reverse.

2. While Dr. Basta claimed that a lab test revealed Ms. Stokes had not been ingesting prescribed Lithium tablets on the ward, she acknowledged that some other factor could explain the test results. Ms. Stokes contended that she had not been issued Lithium tablets for a week or two while on the ward because the staff had misplaced a medication sheet. The hospital did not dispute this claim.

3. Ms. Stokes' outpatient commitment was revoked on September 5, 1985 and she filed her notice of appeal on September 13, 1985. The James decision was handed down on April 4, 1986 after Ms. Stokes' revocation had become final but while her appeal was pending.

4. The attempt by the dissent to equate the retroactivity question in this case to the civil case of *Chevron Oil v. Hudson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), rather than to *Griffith, supra,* reflects the "literal application" strategy, incompatible with the purposes of the Ervin Act which this court recognized in *In re Lomax,* 386 A.2d 1185 (D.C. 1978) (en banc). While involuntary commitment is a civil proceeding, it involves a deprivation of liberty which can not be accomplished without due process of law. *See O'Connor v. Donaldson,* 422 U.S. 563, 580, 95 S.Ct. 2486, 2496, 45 L.Ed.2d 396 (1975) (Burger, C.J., concurring); *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972); *In re Ballay,* 157 U.S.App.D.C. 59, 482 F.2d 648 (1973).

Moreover, it is somewhat ironic that the dissent embraces a civil case which applied nonretroactive application of a new holding to avoid

Even if the "clear break" analysis was extant and we concluded that the requirement of an explicit finding constituted a "clear break," however, we would find error in the trial court's failure to abide by the least restrictive treatment principle developed by this court in earlier cases. *See In re Richardson,* 481 A.2d 473, 479–80 (D.C. 1984); *In re Mills,* 467 A.2d 971 (D.C. 1983). In *Mills,* this court held that committed outpatients have a legitimate expectation, worthy of due process protection, that they may continue to enjoy the freedom outpatient status entails unless the hospital can satisfy the court that inpatient hospitalization is the least restrictive appropriate treatment. *Id.* at 975; *accord In re Richardson, supra,* 481 A.2d at 478–79. This expectation derives from the Ervin Act, which has been interpreted to impose a duty on the court at the initial commitment to select the least restrictive alternative which would serve the purposes of commitment. In revoking outpatient commitment, the trial judge in the instant case, made comments indicating his perception that the obligation to consider less restrictive alternatives was the duty of the original committing court, but that it was not necessary for him to undertake a search for a less restrictive treatment at the outpatient revocation stage. This construction, of course, runs counter to the underlying purpose of the Act. *See* D.C.Code § 21–545 (b); *Lake v. Cameron,* 124 U.S. App.D.C. 264, 266–67, 364 F.2d 657, 659–60, *cert. denied,* 382 U.S. 863, 86 S.Ct. 126, 15 L.Ed.2d 100 (1966).

The idea of requiring the least restrictive appropriate treatment is based on the notion that "government should not constrict the freedom of its citizens to any greater degree than the community needs require." Chambers, *Alternatives to Civil Commitment of the Mentally Ill: Practical Guides and Constitutional Imperatives,* 70 MICH.L.REV. 1107, 1138 (1972). Accordingly, this court has observed that "[t]he statutory scheme in this jurisdiction does not limit the court in a commitment proceeding to a polarized choice between indefinite hospitalization and unconditional release: it makes 'the entire spectrum of services ... available, including outpatient treatment, foster care, halfway houses, day hospitals, nursing homes, [and others].'" *In re Mills, supra,* 467 A.2d at 974–75 (citing *Lake v. Cameron, supra,* 124 U.S. App. D.C. at 266–67, 364 F.2d at 659–60) (quoting S.REP. No. 925, 88th Cong., 2d Sess. 31 (1964)).[5]

Of course, if the least restrictive treatment principle is to be more than just an abstract idea, there must exist a broad range of mental health services and programs.[6] The record before us is devoid of significant information, and appellant has not suggested in this court the absence of less restrictive alternative programs and services in the District of Columbia.[7]

an injustice (*Chevron*) and at the same time rejects a criminal case which applied retroactive application to avoid an even greater injustice (*Griffith*).

**5.** *See also Lessard v. Schmidt,* 349 F.Supp. 1078, 1096 (E.D.Wis.1972), *vacated and remanded on other grounds,* 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974) (holding that the Constitution compelled the state to establish the unsuitability of numerous alternatives to involuntary full-time hospitalization before commitment could be ordered, including "voluntary or court-ordered out-patient treatment, day treatment in a hospital, night treatment in a hospital, placement in the custody of a friend or relative, placement in a nursing home, referral to a community mental health clinic, and home health aide services").

**6.** *See Developments in the Law—Civil Commitment of the Mentally Ill,* 87 HARV.L.REV. 1190, 1250–51 & n. 265 (1974) ("[t]he requirement that less drastic alternatives to hospitalization be employed is of little practical significance if alternatives do not exist"); NATIONAL CENTER FOR STATE COURTS, GUIDELINES FOR INVOLUNTARY CIVIL COMMITMENT, MENTAL AND PHYSICAL DISABILITY LAW REPORTER, Sept./Oct. 1986, at 423 (Guideline A2: "The existence of a continuum of care provided by state hospitals, community mental health services, and related social services is a prerequisite to fair and workable commitment practices.").

**7.** At the hearing, appellant's counsel was the only party to attempt to identify some alternative treatment which would be less restrictive than inpatient hospitalization (counsel referred to the alternative of residence in the community with daily visits to the hospital to participate in a treatment program). The government presented no less restrictive alternatives for the treatment of Ms. Stokes' problems, and the court made no inquiry or attempt to elicit other available programs or services that might help

Thus, appellant does not argue here that the trial court could not fulfill its responsibility to consider less restrictive alternatives because such alternatives do not exist. Indeed, we note that the District of Columbia, in preparing for the transfer of St. Elizabeths Hospital from federal control to the local Department of Human Services, has drawn comprehensive plans aimed at providing a wide spectrum of alternative programs, placement, and services to meet individual patient needs.[8] *See* DISTRICT OF COLUMBIA DEPARTMENT OF HUMAN SERVICES (Reorganization Plan No. 3 of 1986): FINAL MENTAL HEALTH SYSTEM IMPLEMENTATION PLAN, at II–10—II–11.[9] The implementation of these plans, and the cooperation of counsel and the committing courts will do much in helping us to meet the requirements of the Ervin Act.

■ Thus, respondent's counsel can play an important role in determining disposition alternatives. *See* NATIONAL CENTER FOR STATE COURTS, GUIDELINES FOR INVOLUNTARY CIVIL COMMITMENT, *supra,* at 484 ("The respondent's counsel has the incentive to explore and to present evidence of less restrictive alternatives, stemming from his or her obligation to protect the client's liberty interests."). *See also* CRIMINAL PRACTICE INSTITUTE, TRIAL MANUAL at 14.57 (1986) (encouraging counsel to attempt to develop an alternative plan for the client if the respondent disagrees with the hospital's proposed disposition). Nevertheless, it is the *state's* burden to demonstrate the existence and unsuitability of various treatment alternatives, not respondent's, and it is the trial court's responsibility to ensure that the state meets this burden. *See Lake v. Cameron, supra,* 124 U.S.App.D.C. at 268, 364 F.2d at 661 ("Appellant may not be required to carry the burden of showing the availability of alternatives ... appellant plainly does not know and lacks the means

to ascertain what alternatives, if any, are available, but the government knows or has the means of knowing and should therefore assist the court in acquiring such information."). *See also Developments in the Law—Civil Commitment of the Mentally Ill, supra,* 87 HARV.L.REV. at 1250–51 n. 265 (discussing benefits of placement of burden on state) ("treating the consideration of alternatives as part of the government's case would force the party advocating commitment to examine alternatives prior to instituting proceedings and would perhaps allow the entire procedure to be avoided by the development of a mutually agreeable voluntary treatment plan").

■ The role of the trial court in searching for treatment alternatives as well as weighing the merits of such alternatives is no less significant. The wide spectrum of patient needs requires the careful consideration of several factors in determining the least restrictive appropriate treatment. The trial court should undertake an inquiry which explores not only the availability of an alternative, but its worth when measured against the aspects of a given disposition, including (1) time: that is, what is the duration of commitment? (2) program therapy: *e.g.,* will the patient be enrolled in a specific treatment plan? Will he or she be receiving individual psychotherapy? (3) activity or conduct: can we help solve the problem by prohibiting or proscribing specific conduct? and (4) location: should the patient be required to live in a certain setting?[10] Certainly, the trial judges are in a better posture to explore other factors best tailoring a specific commitment to a specific alternative.

### III

Appellant also argues that the evidence of her mental illness and dangerousness

---

Ms. Stokes combat her drug problem without depriving her of her liberty.

8. Like the court in Lake, we express no opinion on questions that would arise where alternatives to confinement do not exist. *See Lake v. Cameron, supra,* 124 U.S.App.D.C. at 268, 364 F.2d at 661.

9. *See also* Weiser, *Survival Versus Freedom: Patient Struggles in Dilemma,* Washington Post, Sept. 28, 1987, at A8, col. 1.

10. *See* NATIONAL CENTER FOR STATE COURTS, GUIDELINES FOR INVOLUNTARY CIVIL COMMITMENT, *supra,* at 498 for a more detailed explication of these considerations.

was insufficient. I agree that the evidence supporting a finding that Ms. Stokes was mentally ill and dangerous due to mental illness was deficient in several respects.

■ As noted, *supra* at 358, the trial court's decision to revoke Ms. Stokes' outpatient commitment was based solely on the testimony of Dr. Basta, the hospital's only witness. Most of the testimony presented consisted of vague, conclusory statements. In describing Ms. Stokes' behavior since the time of her outpatient commitment, Dr. Basta used only the broadest terms such as "violent" and "threatening." No details to describe Ms. Stokes' conduct were offered.[11] She suggested that there had been several readmissions since the time of the outpatient order, but did not specify their number or their dates. Her account of the August, 1985 admission that precipitated the revocation proceeding was derived solely from Ms. Stokes' mother and the admitting psychiatrist. Indeed, her testimony employed very general terms. The doctor had no personal knowledge of the behavior which she characterized.

In *In re James, supra,* note 1, the hospital's expert witness was unable to furnish details of dangerous conduct in which respondent had allegedly engaged, nor was the doctor always able to specify when such conduct had occurred. Here, Dr. Basta's accounts of Ms. Stokes' alleged dangerous behavior took the form of mere conclusory statements of the same sort that this court in *James* found to be unreliable and inadequate to support revocation. Such vague and conclusory hearsay statements, without factual underpinnings, cannot alone support a finding of mental illness and dangerousness.

This court has long expressed the need for expert witnesses to avoid conclusory statements in testifying as to a person's mental health. "Too often conclusory labels—both medical and legal—have substituted, albeit unwittingly, for the facts and analysis which underlie them." *Washington v. United States,* 129 U.S.App.D.C. 29, 38, 390 F.2d 444, 453 (1967). In *Washing-*

*ton,* the court was concerned that psychiatric testimony would either confuse the jury or usurp its role in deciding the ultimate issue of guilt. Accordingly, the court required an instruction be given in the presence of the jury cautioning the expert witness to speak in clear and nonconclusory terms and to limit his opinion testimony to matters in the range of medical expertise. *See also In re Mendoza,* 433 A.2d 1069, 1070 n. 2 (1981); NATIONAL CENTER FOR STATE COURTS, INVOLUNTARY CIVIL COMMITMENT, *supra,* at 485 n. 8 ("leading questions and conclusory responses by a mental health expert witness should be insufficient to carry the state's burden of proof if a respondent's attorney challenges the adequacy of that evidence and presents less restrictive alternatives to the court").

■ Predictions about the likely course of a respondent's mental disorder and his or her future behavior with or without compulsory treatment and care, especially predictions about future dangerous behavior, are extremely difficult to make within acceptable levels of reliability and accuracy. Thus, decisions affecting a respondent's liberty often hinge on subjective interpretations of ambiguous behavior and responses. A patient has a conditional liberty interest in remaining on outpatient status. Due process mandates that vague, conclusory statements based primarily on hearsay and not personal observation from one witness should not be sufficient to support a total deprivation of liberty. Thus, I reiterate this court's conclusion in *James* that the hospital should present the testimony or affidavits of witnesses, such as family members, with *direct* knowledge of the respondent's conduct. *Id.* at 158–59. *See also* NATIONAL CENTER FOR STATE COURTS, INVOLUNTARY CIVIL COMMITMENT *supra,* Guideline F9 at 488 (recommending that except in extraordinary circumstances, the court should hear the testimony of at least one person who observed the conduct that led to the filing of the commitment petition, and from at least one psychiatrist or clinical psychologist who personally ex-

---

11. The one incident she did describe in some detail was the "provocative" dancing, which clearly cannot support a finding of dangerousness.

amined the respondent after the filing of the petition or after the respondent was taken into custody).

▮ The doctor's testimony was also deficient because of the lack of a nexus between Ms. Stokes' dangerous behavior while an outpatient and mental illness. The *James* court noticed the same deficiency as contributing to its decision to overturn James' revocation. The doctor here twice noted that Ms. Stokes had been admitted to the hospital exhibiting symptoms of PCP intoxication. She never asserted that Ms. Stokes' dangerous conduct was caused by a disorder that would constitute a mental illness under the Ervin Act, or whether the behavior was instead the product of PCP use. Drug addiction or intoxication, even though it may produce dangerous behavior, does not constitute a mental illness within the meaning of the Ervin Act. *See* S.REP. NO. 925, 88th Cong., 2d Sess. 13 (1964); *In re Alexander,* 125 U.S.App. D.C. 352, 372 F.2d 925 (1967); *see also In re Marquardt,* 100 Ill.App.3d 741, 56 Ill. Dec. 331, 427 N.E.2d 411 (1981) (drug dependency in itself does not constitute a mental illness requiring commitment). If Ms. Stokes' alleged misconduct was solely the product of PCP use, it would not provide a basis for revoking her outpatient commitment. To commit a mentally deficient person under the Act, the state must show "that the danger-productive behavior of the individual results from the mental illness." *In re Alexander, supra,* 125 U.S. App.D.C. at 354, 372 F.2d at 927.

▮ The hospital failed to present any reason to revoke Ms. Stokes' outpatient status other than her failure to take her medication while in the community. A revocation of outpatient commitment based solely upon a patient's failure to comply with the prescribed course of outpatient treatment, without reliable evidence in the record that the patient is likely to be dangerous as a result of her mental illness would violate the Act. D.C.Code §§ 21–545(b), –547.

▮ To commit a mentally deficient person under the Act, it is necessary for the government to prove that the individual suffers from a mental illness and that the danger-productive behavior of the individual results from the mental illness. *In re Alexander, supra,* 125 U.S.App.D.C. at 354, 372 F.2d at 927. New findings of mental illness and dangerousness must be made at the revocation hearing. Appellant's failure to take her medication is not a basis in and of itself for revocation of outpatient status. *See Friend v. United States,* 128 U.S.App.D.C. 323, 325, 388 F.2d 579, 581 (1967) ("the District Judge made no findings as to the appellant's mental condition and dangerousness, and we think such findings, and the focus they imply, are required. The sole reason for revocation mentioned in the order is the fact that appellant failed to comply with conditions. While that fact is obviously significant, it is not the sole or ultimate consideration."). *See also In re Richardson, supra,* 481 A.2d at 479 n. 5; *accord In re James, supra,* 507 A.2d at 157–58.

▮ Finally, the hospital failed to produce evidence sufficient to establish that indeterminate hospitalization was the least restrictive treatment alternative. The hospital, not Ms. Stokes, had the burden of demonstrating that no alternative less restrictive than indefinite inpatient hospitalization would suffice. *Richardson, supra,* 481 A.2d at 479 n. 4; *accord Lake, supra,* 124 U.S.App.D.C. at 268, 364 F.2d at 661. The hospital failed to explain why temporary revocation was not a satisfactory alternative in Ms. Stokes' case. Moreover, Dr. Basta testified that upon Ms. Stokes' August 1985 admission, the doctor switched her to a more effective medication, and Ms. Stokes improved rapidly. Also, Dr. Basta acknowledged that Ms. Stokes was now participating in a program specifically tailored to her needs—the dual diagnosis program—and in three weeks time had already developed greater insight into her drug abuse. No such program had been made available to Ms. Stokes prior to initiation of the revocation proceeding. Ms. Stokes testified that she found the program beneficial and would willingly return to the program each day if returned to outpatient status. Despite this evidence of

improvement, the doctor did not explain why Ms. Stokes could not remain as an outpatient temporarily in lieu of indefinite inpatient status.

If Ms. Stokes were still hospitalized, under the commitment order, we would remand with directions to make further findings. Since it appears that her status has changed, we instead vacate the order. This action does not affect the validity of Ms. Stokes' original outpatient commitment. *See In re James, supra,* 507 A.2d at 159.

*So ordered.*

ROGERS, Associate Judge, concurring:

I join in reversing the judgment on the ground that the trial court failed to make a finding that inpatient commitment was the least restrictive alternative treatment to Ms. Stokes. *In re James,* 507 A.2d 155, 158 (D.C.1986). *See Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). *See also In re Richardson,* 481 A.2d 473, 480 (D.C.1984); *In re Mills,* 467 A.2d 971, 975 (D.C.1983); *Lake v. Cameron,* 124 U.S.App.D.C. 264, 364 F.2d 657, *cert. denied,* 382 U.S. 863, 86 S.Ct. 126, 15 L.Ed.2d 100 (1966). Instead the court focused on the responsibility of the Mental Health Commission and others to identify the least restrictive treatment alternative for a patient at the time of the patient's initial commitment. At no time during the hearing did the court acknowledge that this was a continuing responsibility of the court when a revocation of outpatient commitment is sought by the hospital. The court simply concluded that Ms. Stokes "would be a serious problem if returned to the community" because she would not continue to take her medication. Neither the statute nor judicial opinions in this jurisdiction sanction that ground alone as a basis for revocation of outpatient treatment. *See, e.g., In re Richardson, supra,* 481 A.2d at 479 n. 5; *accord, In re James, supra,* 507 A.2d at 158.

BELSON, Associate Judge, dissenting:

Respectfully, I dissent. A fair reading of the transcript establishes, in my view, that the trial judge found that inpatient treatment was the least restrictive treatment for Ms. Stokes. The evidence was sufficient to support that finding.

As a member of the division that decided *In re James,* 507 A.2d 155 (D.C. 1986), I joined in Judge Rogers' opinion for the court. Although the trial judge who decided the instant case did not have the benefit of our as yet unannounced holding and treatment of the law in *James,* the focus of the hearing he conducted and the essential findings he made in the context of that hearing satisfy the test to which we subjected the *James* record. In *James,* we reaffirmed that the trial court, in weighing a petition to revoke the outpatient status of a committed patient pursuant to D.C. Code § 21–545(b) (1981), "must abide by the least restrictive treatment principle," and we announced for the first time that the trial court's decision must "be supported by an explicit finding that the proposed treatment is the least restrictive alternative." *Id.* at 158. Evaluating the record in James, we stated:

> [I]n the absence of an indication in the record that the judge recognized his obligation to determine whether revocation of James' outpatient commitment was the least restrictive treatment alternative, we decline to construe the Act to permit the trial judge to fulfill his duty on the basis of conclusory medical and imprecise factual information.

*Id.* at 159. Our language indicated that we reversed the trial court not because of its failure to observe our newly announced requirement of an explicit finding regarding alternative treatment, but because it did not recognize its obligation to consider that question at all.

In her opinion expressing her views and announcing the result of this appeal,[1] Judge Mack notes that in *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.

---

**1.** There is no opinion of the court in this appeal, as no judge has joined in the opinion of another judge.

2d 649 (1987), the Supreme Court "held that a new rule for the conduct of criminal prosecutions applies retroactively to all cases pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." Maj. Opinion at 359. The opinion then goes on to observe that *James* was decided while the instant case was pending direct review, and concludes that, "by analogy," we should apply James to the instant case. *Id.* *Griffith*, however, does not control this civil commitment case, for *Griffith* deals specifically with criminal cases. *Griffith, supra,* 107 S.Ct. at 716 ("We therefore hold that a new rule for the conduct of *criminal prosecutions* is to be applied retroactively to all cases...." (emphasis supplied)). Notably, *Griffith* and its predecessors "did not address the area of civil retroactivity," *id.* at 713 n. 8, which continues to be governed by the standard announced in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971) (retroactivity determined after considering whether a new principle of law has been established, the prior history of the rule in question, and whether substantial inequitable results would be produced).[2] Applying *Chevron*, I would conclude that *James* is not retroactive.[3] Indeed, as I point out above, our reversal in *James* flowed from our conclusion that absent from the record was any indication that the judge recognized his obligation to apply the least restrictive treatment alternative. Thus, while *James* confirmed the trial court's obligation in that respect, it did not purport to apply its new requirement of an explicit finding retroactively; it reversed because of the absence of any "indication" that the trial judge

applied the right test, not because of the absence of an explicit finding.

Turning to the hearing in this case, its entire context demonstrates that the parties and the court dealt with the petition for revocation of outpatient status as raising the issue of whether inpatient treatment was the least restrictive alternative, *i.e.,* whether inpatient status was necessary. To put it plainly, that was what the hearing was all about. Focusing on that issue, the government argued that Ms. Stokes "does *need* a period of hospitalization to stabilize...." (emphasis supplied). Ms. Stokes' counsel, in his closing argument, stated: "Your Honor, the burden today is on the Government to establish by a preponderance of the evidence that Ms. Stokes is so dangerous to herself or others as a result of mental illness that she must be treated on an inpatient basis." The judge did not disagree. To the contrary, he referred to the least restrictive alternative himself when he noted that the Mental Health Commission is "charged by the statute to do all that they can to have the least restrictive circumstance." He continued,

isn't it fair to say that first time up we'll resolve all doubts in favor of release, even though it may strike us that maybe that's not the thing to do. But let's bend over backwards, if you will, to attempt to find some sort of program in the community that the patient will benefit from. Having done that, it seems that a more subsequent history since March of well, we tried, but it just didn't work. Isn't that really what we have here?

The judge then noted that Barbara D. Basta, M.D., a psychiatrist with St. Elizabeth's Hospital who had treated Ms. Stokes, "didn't say bend over backwards but she

---

2. Contrary to the apparent purport of the lead opinion, *supra* at p. 359 n. 4, the applicability of *Chevron* to this case flows not from a "literal application strategy" regarding the controlling statute, but from the fact that the case before us is not a criminal proceeding. While it is true that this court held in *In re Lomax,* 386 A.2d 1185 (D.C. 1978), that the government may not appeal an adverse result in a civil commitment case, this court has not accorded to such proceedings all the trappings of a criminal proceeding.

3. The specific application of the *Chevron* standards is as follows: in *James,* we created a new standard governing the manner in which trial judges must adjudicate such revocation hearings; the particular standard we imposed was not foretold by previous case law; and, finally, it would be inequitable to reverse for failure to adhere to particular form in making findings when the proceedings as a whole make it clear that the court applied the correct legal standard and found that the patient required inpatient treatment.

almost said that her inclination is to try her best to find some sort of program in the community. I think that is what the Commission did here." The trial judge then concluded, in light of Ms. Stokes' poor performance in outpatient status as described and interpreted in the testimony of Dr. Basta, that Ms. Stokes "would be a serious problem if returned to the community." In other words, he concluded that nothing short of inpatient status was appropriate for Ms. Stokes. Weighing the adequacy of the trial judge's findings, just as we did in *James,* I think we should conclude that he gave clear indication that he recognized his obligation to apply the least restrictive alternative treatment principle, and indicated unmistakably his conclusion that outpatient treatment was, at the time, inappropriate.

I turn briefly to the additional conclusion of Judge Mack's opinion that the record here would not support a finding that inpatient treatment was necessary. The record, to the contrary, contains telling evidence of the need for inpatient treatment. Dr. Basta testified that Stokes

was readmitted on August the 6th in the evening, brought in by her mother who stated that Ms. Stokes was semi-delusional, became assaultive towards the mother, threatening, aggressive, hostile. And at the admission she presented herself very much the same way. Her condition was described by the admitting psychiatrist as ... agitated, uncooperative, hostile, threatening at that time.

Dr. Basta stated that she had "taken care of Ms. Stokes before and I knew her very well." The doctor demonstrated that she was quite familiar with Stokes' drug treatment protocol, and testified that Stokes had no insight into her mental condition and the impact of her drug problem upon it. Dr. Basta also testified that based on all this,

her history, her coming and going, I can say very well that she will not survive for a long time if released right now. As long as Ms. Stokes does not understand that she needs treatment for her emotional problem, she will stop taking her

medication and then go back to drugs, and a few days later she's right back in the hospital.[4]

She stated finally that she could "see clearly that she cannot function on outpatient even as a committed."

In light of the foregoing, I cannot agree with Judge Mack's conclusion that "the evidence of [Ms. Stokes'] mental illness and dangerousness was insufficient." Opinion at 2. While more specifically with regard, for example, to Stokes' hostile and threatening behavior upon readmission would have been preferable, the testimony was more substantial than that which we found inadequate in *James,* and was sufficient to support the trial court's ruling. It was not necessary for the hospital to call witnesses other than the psychiatrist who treated Stokes in order to establish the need for inpatient status. While I agree that the court's inquiry can be aided substantially by the testimony of witnesses such as family members who have direct knowledge of the patient's conduct, it seems too much to say that this court concluded in *James* that "the hospital should present the testimony or affidavits of witnesses, such as family members, with *direct* knowledge of the respondent's conduct." Maj. Opinion at 363. Rather, we referred in *James* to the lack of such evidence in the course of commenting on the general weakness of the hospital's case.

In summary, I view the case before us as a close one in which the record affords the requisite indication that the judge recognized his obligation to determine whether revocation of Ms. Stokes' outpatient status was the least restrictive alternative, and contains sufficient evidence to warrant our affirming the trial court's conclusion that outpatient status was not at that time a viable alternative for Ms. Stokes.

I add that in view of the fact that Ms. Stokes was already on convalescent leave at the time the case came before us for argument, the principal utility of the three

---

**4.** Dr. Basta specified three dates on which Stokes was readmitted. She was interrupted by counsel for Ms. Stokes when she was enumerating the dates of readmissions. It therefore is not clear whether there were other readmissions before August.

opinions here is to reemphasize our holding in *James* that the trial court must both abide by the least restrictive treatment principle, and make an explicit finding regarding least restrictive alternative, before it can revoke an outpatient commitment.