**In the Matter of Julia A. GAHAN, Appellant.**

**No. 86–1314.**

District of Columbia Court of Appeals.

Argued July 6, 1987.

Decided Sept. 30, 1987.

David A. Reiser, Public Defender Service, with whom James Klein, Public Defender Service, Washington, D.C., was on brief, for appellant.

Eva Marie Carney, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on brief, for appellee.

Before MACK and NEWMAN, Associate Judges, and GALLAGHER, Senior Judge.

NEWMAN, Associate Judge:

Julia A. Gahan was civilly committed to Saint Elizabeths Hospital after a trial without a jury. She maintained on appeal that there was insufficient evidence to support the trial court's finding that she was likely to injure herself if allowed to remain at liberty. *See* D.C.Code § 21–545(b) (1981). She also objects to two evidentiary rulings of the trial court. Finding the evidence to be sufficient, and the evidentiary rulings to be without error, we affirm.

I

Julia Gahan was brought to Saint Elizabeths Hospital (hereinafter, "the Hospital") on December 4, 1985, on the emergency application of a physician employed by the D.C. Crisis Resolution Branch of the Department of Human Services. The emergency application cited Gahan's disruptive behavior at the Luther Place Night Shelter, where she had been staying for several months, and went on to state the physician's conclusion, based on personal exami-

nation, that Gahan was mentally ill and likely to injure herself or others.

After an initial period of emergency hospitalization for the purpose of observation, the Superintendent of the Hospital petitioned the Superior Court for an order of judicial commitment pursuant to D.C.Code § 21–541 (1981). In accordance with statute, hearings were held before the Commission on Mental Health. After a final hearing conducted on February 9, 1986, the Commission concluded that Gahan was suffering from chronic schizophrenia of the paranoid type, and was in need of long term inpatient treatment, without which her mental condition would deteriorate and she would become a danger to herself and others. It was recommended to the court that Gahan be committed as an inpatient.

Trial on the Hospital's petition began on April 29, 1987.[1] In support of its petition, the Hospital presented the testimony of three witnesses: (1) Christy Schoeld, the coordinator of the Luther Place Night Shelter, where Gahan had stayed for several months before her admission to the Hospital, (2) Wendy Urban, a staff worker at both the Luther Place Shelter and the Bethany Women's Day Shelter where Gahan received daytime services, and (3) William Carter, M.D., a Hospital psychiatrist.

Christy Schoeld testified that she first met Julia Gahan on September 11, 1986, when Gahan first came to the Luther Place Shelter, and that she saw Gahan daily thereafter. She related that Gahan did not change her clothes or bathe during her three month stay at the shelter, and that she became infested with lice. She testified also that Gahan would stand outside in the rain and in very cold weather clad only in a light sundress and sneakers, ignoring the entreaties of shelter staff workers that she come inside, and refusing the warm clothing available to her at the day shelter. Schoeld stated that "she was not doing well as far as taking care of her physical self at all."

Schoeld related that she had observed Gahan spend the length of several days standing on the sidewalk in front of the shelter, rocking back and forth with her hands clenched. At the approach of a car, she would move up to the edge of the curb, lean forward, and yell at the car as it drove by. She could not be persuaded to stop this activity.

Schoeld described some of Gahan's hostile behavior toward other residents of the shelter. "She would be very obtrusive and stand in people's way and not let people go by." She exhibited hostile body language, and had a habit of clenching her fists. She paced continually. Throughout the night, she would pace about the shelter disturbing the sleep of other residents, which sometimes "created some commotions"; she could not be persuaded to stop pacing. She had delusions that she was pregnant and that shelter staff were trying to kill her babies. Schoeld informed the court that the Luther Place would not readmit Gahan if she were released from Saint Elizabeths as their experience showed that she would not stay on her prescribed medication, and her behavior without it would be disruptive to the shelter.

In addition to the above testimony based upon her personal observation, Schoeld testified, over objection, as to notations concerning Gahan which had been entered in a logbook kept by shelter staff. The logbook contained entries made by staff every day concerning shelter residents; the staff relied heavily upon it, and used it for their weekly staff meetings. According to Schoeld's testimony, it was noted in the logbook that Gahan had not eaten for the two weeks preceding her admission to St. Elizabeths—"none of the staff workers saw her eating a meal." Logbook entries also related that Gahan had had a fight with one of the shelter residents, had hit four or five others, and had thrown food at still others. It was also noted in the log that Gahan sometimes punched herself.

Wendy Urban, the Hospital's second witness, worked two nights a week at the Luther Place Shelter and full-time at the Bethany Day Center across the street. She had met Julia Gahan in September and

1. Gahan originally requested a jury trial, but later withdrew that request.

had been in daily contact with her thereafter. Urban testified that during the course of that time, Gahan became more and more dirty and unkempt, and rarely changed her clothes. She described Gahan as "silently hostile"; during her final month at the shelter, Gahan would intentionally block other women's pathways, or jab them with her elbows. Gahan had once thrown hot tea at another resident, had thrown a plate of spaghetti at the shelter's visiting psychiatrist, and had once kicked Urban herself in the shin. Urban also testified, over objection, that she had read in the logbook that Gahan had been in a fight with another woman, although she could not say how the fight began nor who started it.

During the last week in November, Urban had seen Gahan standing outside for hours in the cold, dressed only in a sundress and a light blazer. A few days before Gahan's admission to the Hospital, Urban had observed her standing on a street corner outside the shelter during an entire afternoon and evening, "slinging her arm into her own side." For at least one week prior to Gahan's admission to the Hospital, Urban had not seen her eat lunch at the day center.

The Hospital's final witness was Dr. William Carter, a staff psychiatrist at Saint Elizabeths Hospital. Dr. Carter had treated Gahan from the time of her admission to the Hospital on December 4, 1986, until February 14, 1987, when she was transferred to another ward; he continued to see her thereafter on her return visits to his ward. Dr. Carter based his expert testimony upon his many examinations of Gahan, his review of the medical records of her several admissions to Saint Elizabeths, and his conversations with other staff members who had treated her. Dr. Carter testified that Gahan was suffering from schizophrenia of the paranoid type. She suffered from delusions that food and medication would kill her, and that medication was

"raping her." On two occasions, once for a period of several days after her admission and later during another two day period, Gahan refused to eat anything or to take antipsychotic medication. On both occasions, Dr. Carter ordered that she be involuntarily medicated, after which she resumed eating. Gahan refused medication intermittently thereafter, each time having to be "emergency medicated."

According to Dr. Carter, mental illness is chronic and can only be controlled by medication. He testified that the medication prescribed for her, prolixin decanoate, had "improved her tremendously," but despite it, she continued to show signs of psychosis, including hostility and delusions. Without the medication, in Dr. Carter's opinion, Gahan would "decompensate,[2] and return to her previous admission state of being very hostile, very agitated, disruptive, not eating." He was of the opinion that if released, Gahan would not take her medication. His opinion was based, in part, upon Gahan's repeated statements to him that she did not feel she needed any medication, and that she would not take any if released. In other part, his opinion was based upon his review of her past medical records. Over objection, he testified that these records revealed that she had been admitted to mental institutions thirteen times in the past, and that on at least ten of these occasions, after being released, she had ceased taking her prescribed medication and had to be returned to the hospital.

Finally, Dr. Carter gave his opinion that if released, Gahan would be a danger to herself. Specifically, he testified that if released from the hospital, Gahan would cease taking her antipsychotic medication and would return to her delusions that food and medication were hurting her, delusions which consistently resurfaced when she was not medicated. She would stop eating, as she had done in the past.[3] "The specific

---

2. "Decompensation" is defined as a "failure of defense mechanisms resulting in progressive personality disintegration." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 349 (26th ed. 1981).

3. Dr. Carter testified that Gahan had twice suffered severe weight loss as a result of her refusal to eat subsequent to psychiatric decompensation. Once, in 1979, she was admitted to a medical hospital with severe dehydration after

danger would be her not eating and her becoming severely dehydrated," and possibly "numerous other medical problems that can come from that."

Julia Gahan testified on her own behalf. She stated that she washed herself and her underclothes each night at the shelter, but put her clothes back on wet because they had once been stolen when she had left them hanging to dry. She denied that she had had lice. She also denied that she had a hostile attitude at the shelter. As to her failure to wear a coat outside in the cold weather, she explained that the coat offered to her by the shelter was too big and looked sloppy. She testified that she ate regularly at the shelter.

Gahan explained that she had not been yelling at cars, as Christy Schoeld had testified, but had been hollering "hi" to them. She admitted that she had been in a fight with another resident of the shelter, but explained that she was not the aggressor, and was merely reacting to repeated provocation. She had thrown a plate of spaghetti at the psychiatrist because he had insulted her by asking if she had slept with any of the other women at the shelter. She had thrown tea at a woman at the shelter because that woman had called her a "slut." She admitted that she did not eat upon her admission to the Hospital, but explained that she had had a pain in her spleen, and found that not eating helped the condition. She also explained that she had lost a good deal of weight in 1979 and had become dehydrated because the government-run program through which she obtained meals had run out of money; after going without food for four days, she checked herself into a medical hospital.

Gahan acknowledged that she was mentally ill while at the shelter, but did not think that she was still mentally ill. She admitted that she did not want to take medication, but said she would see a psychiatrist in the community, and take prescribed medication, "if the Court says I have to."

After hearing the evidence summarized above and the arguments of counsel, the court found that Gahan was mentally ill, and that, while not dangerous to anyone else, was likely to injure herself if not hospitalized. The court therefore ordered Gahan hospitalized for an indeterminate period, pending a disposition hearing. The disposition hearing was held on June 11, 1986, after which the court ordered that Gahan be hospitalized for an indefinite period.

II

Gahan does not challenge the trial court's finding that she is mentally ill. She concedes, moreover, that there was evidence presented indicating that she will, if released, cease to take prescribed antipsychotic medication, and will therefore decompensate. However, she claims that the government "failed to show the result of decompensation will be danger to Ms. Gahan or to anyone else."

■■■ A court order for involuntary hospitalization must rest upon a finding, based upon clear and convincing evidence, that the subject, if allowed to remain at liberty, is likely to injure herself or others as a result of mental illness. D.C.Code § 21–545(b) (1981); *see In re Mendoza*, 433 A.2d 1069, 1070–71 (D.C.1981); *In re Nelson*, 408 A.2d 1233, 1238 (D.C.1979). We have deliberately declined to overdefine the term "injure." "The term ... is sufficiently vague and the panoply of aberrant conduct requiring civil commitment sufficiently unforeseeable that our only guidance for judges is to require them to tailor the instruction on a case by case basis, in the common law tradition." *Mendoza, supra*, 433 A.2d at 1072. Although the term "injure" connotes an element of danger, *id.* at 1071–72, the danger need not necessarily be physical nor involve violence. *In re Bumper*, 441 A.2d 975, 978 (D.C.1982); *In re Snowden*, 423 A.2d 188, 191 (D.C.1980). All that is required is that the subject be

having lost 32 pounds. On another prior occa- sion, she had lost 50 pounds.

found likely, by reason of mental illness, to "inadvertently place himself in a position of danger or ... to suffer harm." *Id.* at 191.[4]

■ The trial judge, applying an appropriate legal standard,[5] found that the likelihood of self-injury was sufficient to justify involuntary hospitalization. We find ample evidence in the record to support this finding. The testimony showed that Gahan was unable to care for herself, to a degree which put her in potential physical danger. Both Christy Schoeld and Wendy Urban related that Gahan had a habit of standing outside for hours in cold or rainy weather inadequately clothed. The testimony of all three of the Hospital's witnesses indicated that when Gahan failed to take her antipsychotic medication she was in danger of not eating for extended periods of time. Schoeld testified as to the notations in the staff logbook that Gahan had not eaten for the two weeks prior to her admission to St. Elizabeth's.[6] Urban had not seen her eat lunch at the day shelter for the week preceding her hospitalization. Dr. Carter testified that on two occasions, Gahan had refused to eat anything or take medication for several days. He testified that when unmedicated, Gahan suffered from delusions that food was harmful to her. He gave his expert opinion that if permitted to remain at liberty, Gahan would be a danger to herself. "The specific danger would be her not eating and her becoming severely dehydrated," and "numerous other medical problems that can come from that." He testified as to past instances in which Gahan, after being released from institutions, had suffered severe weight loss and dehy-

---

4. We have refused to mandate jury instructions requiring the jury to find danger based upon a recent overt act. *Snowden, supra,* 423 A.2d at 191, or to find the existence of a high probability of substantial harm to self or others. *Bumper, supra,* 441 A.2d at 978.

5. In announcing its judgment, the court stated, "If I were instructing a jury as to the law in this case, I would say as follows: the phrase to injure herself or others does not necessarily mean physical danger or violence; a person is likely to injure herself within the meaning of the law if that person is likely to become unable to take care of herself ... or if likely to inadvertently place herself in a position of danger or is likely to suffer harm." This standard is basically the instruction which we approved in *Snowden, supra,* 423 A.2d at 191, tailored to the facts of this case. An individual's inability to "take care of herself," in the most basic senses of adequately nourishing herself and protecting herself from the weather, may undoubtedly put her in danger of physical harm.

6. We reject Gahan's contention that this and other notations made in the shelter logbook were inadmissible hearsay. Under Super.Ct. Civ.R. 43–I(a), made applicable to civil commitment proceedings by Super.Ct.Ment.H.R. 4(a)(1), a document falls under the business records exception to the rule against hearsay if (1) it was made in the regular course of business, (2) it was the regular course of the business to make the record, (3) the record was made at or within a reasonable time after the event which it reports. In addition, the person making the record must have had personal knowledge of the recorded event, or have had the facts communicated to her, directly or indirectly, by one who had such personal knowl-

edge and who was acting in the regular course of business. *Meaders v. United States,* 519 A.2d 1248, 1255 (D.C.1986); *In re D.M.C.,* 503 A.2d 1280, 1282–83 (D.C.1986).

Gahan concedes that the "regular course of business" requirements of the rule were satisfied, but maintains that the requirements of contemporaneous recording and personal knowledge were not met. We think the contemporaneous recording requirement was satisfied by Wendy Urban's testimony that the logbook entries were made "every single day." We also think it evident from the testimony of the two shelter staff workers that logbook entries as to events occurring at the shelter were made by shelter staff based upon either their own knowledge of the recorded information, or the personal knowledge of other staff communicating the facts directly or indirectly to the person making the entry. *Compare Meaders, supra,* 519 A.2d at 1256 (testimony of police detective did not show sufficient knowledge of the business and recording practices of hospital to permit admission of medical report on sexual assault victim); *D.M.C., supra,* 503 A.2d at 1282 (document inadmissible when no witness was presented to identify it or to tell how or when it was prepared, who prepared it, or on what information it was based).

Further, even were we to find error committed in admitting logbook entries, we would find the error harmless, since the information contained therein as to Gahan's refusal to eat and her hostile conduct was cumulative to other testimony presented by the witnesses. *See, e.g., Liner v. J.B. Talley & Co.,* 618 F.2d 327, 329 (5th Cir.1980) (any error in admission of business record did not prejudice appellant, where record was cumulative to other evidence).

dration requiring hospital treatment. *See supra* note 3.[7]

Apart from the evidence concerning Gahan's neglect of her personal clothing and nourishment, there was additional evidence that Gahan was likely to place herself in a position of danger. Evidence showed that while at the shelter, Gahan had engaged in aggressive behavior such as intentionally blocking other residents' pathways, jabbing them with her elbows, "creating commotions" by her pacing, kicking a shelter worker, flinging a cup of hot tea at another resident and a plate of spaghetti at the shelter psychiatrist, and standing at the curbside yelling at passing motorists. This evidence would justify a conclusion that such aggressive and hostile conduct was likely as some point to incur retaliation. *See Bumper, supra,* 441 A.2d at 978 & n. 3.

Gahan argues that there was no evidence that her mental illness caused her any serious injury within the past seven years. She contends that she suffered no ill effects from her exposure to the elements, that her abrasive conduct, however annoying, has not evoked violent reactions from others,[8] and that since 1979, she has suffered no physical harm from failure to eat. The appropriate inquiry, however, is whether the subject is likely to injure herself in the future. This prediction does not depend on the individual's having succeeded in causing injury to herself in the recent past. *Cf. Snowden, supra,* 423 A.2d at 191 ("recent overt act" test rejected). With regard to the evidence bearing on Gahan's failure to eat, we have stated that "[i]n assessing appellant's potential danger, the trial court properly could look to ... the history of his conduct." *Nelson, supra* 408

A.2d at 1236. We are unwilling to establish a per se rule limiting the extent of an individual's medical history which a trial court may consider, nor can we say that in this case, evidence of self-inflicted injury dating back seven years is irrelevant to the likelihood of injury in the future.

*Affirmed.*

---

7. Gahan contends that Dr. Carter's testimony as to her prior medical history was inadmissible hearsay. We disagree. It has long been the rule in this jurisdiction that an expert may testify as to reports not in evidence upon which he bases his opinion, if they are of a type customarily relied upon in the practice of his profession. *Smith v. United States,* 318 A.2d 891, 893 (D.C. 1974); *Brown v. United States,* 126 U.S.App.D.C. 134, 142, 375 F.2d 310, 318 (1966), *cert. denied,* 388 U.S. 915, 87 S.Ct. 2133, 19 L.Ed.2d 1359 (1967); *Smith v. United States,* 122 U.S.App.D.C. 300, 304–05 & n. 7, 353 F.2d 838, 842–43 & n. 7 (1965), *cert. denied,* 384 U.S. 974, 86 S.Ct. 1867, 16 L.Ed.2d 684 (1966). The court, as factfinder,

was entitled to learn the factors underlying Dr. Carter's opinion that Gahan was likely to inflict harm upon herself by ceasing to eat. "[T]he psychiatrist's mention of [Gahan's] earlier hospitalizations ... was appropriate and could have been anticipated." *In re Samuels,* 507 A.2d 150, 152–53 (D.C.1986) (footnote omitted).

8. Testimony was presented as to a shelter logbook entry indicating that Gahan had been involved in a fight with one of the other shelter residents, but the entry did not indicate who had provoked the fight.