**In re Edith PERRUSO, Appellant.**

**No. 03–FM–159.**

District of Columbia Court of Appeals.

Argued Jan. 8, 2004.

Decided April 13, 2006.

Kenneth H. Rosenau, Washington, DC, appointed by the court, for appellant.

Lynda S. Abramovitz, Assistant Corporation Counsel, with whom Robert J. Spagnoletti, Corporation Counsel, Edward E. Schwab, Deputy Corporation Counsel, and Tonya A. Robinson, Acting Deputy Corporation Counsel, were on the brief, for appellee District of Columbia.*

Before FARRELL, Associate Judge, and BELSON and TERRY, Senior Judges.**

TERRY, Senior Judge:

This is an appeal from a trial court order revoking appellant's outpatient commitment to Saint Elizabeths Hospital and committing her as an inpatient "for an indefinite period." We are satisfied that the order is amply supported by the evidence of record, and thus we affirm.

I

In August 2001 appellant was civilly "committed to the Department of Mental Health for an indefinite period to participate in an outpatient course of treatment," pursuant to Super. Ct. Mental Health Rule

---

* After oral argument in this case, the title of the District's chief attorney was changed. The Corporation Counsel is now officially known as the Attorney General for the District of Columbia. *See* Mayor's Order No. 2004–92 (May 26, 2004), 51 D.C. Register 6052.

** Judge Terry was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on February 1, 2006.

16.[1] The court noted in its order the conditional nature of this outpatient status, stating "[t]hat if the Respondent fails to abide by the treatment regimen or if the mental condition of the Respondent deteriorates, respondent may be returned to inpatient hospitalization."[2]

About a year later, in August 2002, appellant was rehospitalized at Saint Elizabeths Hospital because of paranoid and delusional behavior. Appellant's refusal to take her medicine had caused her to become unstable and increasingly agitated, irritable, and confused. After the Department of Mental Health filed a timely notice of rehospitalization, the court found probable cause to keep her in the hospital pending the outcome of a full hearing.

Dr. Alican Dalkilic, appellant's treating psychiatrist, was the only witness at that hearing, which was held a few weeks later. He testified that appellant was brought to the hospital by the police after her case manager requested their aid because appellant had stopped taking her medication, started to become manic,[3] refused to let the ACT team[4] enter her home, and failed to attend an appointment with her treating psychiatrist. In addition, appellant became paranoid, stating that Dr. Hornett (one of her treating physicians), her case manager, and her guardian were "doing things behind her [back], trying to get into her bank accounts." She also asserted that "the nurses and doctors [were] trying to destroy her mind and poison her."

After appellant came to Dr. Dalkilic's ward, her paranoia and delusions "improved somewhat," but not enough to justify releasing her back into the community. The doctor stated that appellant's recent "marginal improvement" was directly connected to the resumption and adjustment of her medication following her readmission to the hospital in August 2002. According to Dr. Dalkilic, appellant's delusions become "very intense," causing changes in her behavior, when she stops taking her medication. In the past, appellant has demonstrated that she becomes "optimally stabilize[d]" only when she takes her medications. On at least five such occasions she was released into the community, but she soon stopped taking her medications and had to be returned to the hospital.

Dr. Dalkilic described a "multi-disciplinary team" made up of a social worker, one or more nurses, a psychiatrist, and treating residents who collectively determine whether a patient is fit to become an outpatient again by considering her general psychiatric history, her ability to function in the community, her ability to care for herself with the proper food, clothing, and shelter, and her ability to adhere to any ongoing treatment regimen. In appellant's case, the doctor said, there was no direct evidence that she would harm any-

1. Rule 16 sets forth detailed procedures regarding outpatient commitment and revocation proceedings.

2. Appellant's treatment regimen included taking prescribed medications as well as abiding by a treatment schedule established by the Community Health Center, her case manager, and her treating physician or psychologist.

3. According to Dr. Dalkilic, "manic" meant that "she had ... rapid pressured speech, racing thoughts, disorganized behavior, and also she was using poor judgment. She lost her insight .... [B]asically she was claiming that she didn't have any mental illness, [that] she doesn't need to take any medications. And also she became paranoid, which is documented in the chart."

4. The Assertive Community Treatment ("ACT") team visits an outpatient's home, provides medication, and supervises the administration of this medication to the outpatient.

body or put herself in danger. Appellant does not have a history of violence associated with her mental condition and probably would not be dangerous to others if released from the hospital in almost any condition. However, the doctor was unwilling to recommend her immediate release from the hospital because she acts on her delusions and thus "might very well put herself inadvertent[ly at] risk" of sustaining an injury "due to impaired judgment and psychotic behavior." Until she shows insight into her illness and recognizes that she must take her medication to prevent the delusions, Dr. Dalkilic opined, appellant should not be released.

At the time of the hearing, appellant was still suffering from delusions that impaired her judgment.[5] Dr. Dalkilic opined that she could put herself in danger by acting on those delusions. For example, the doctor cited a recent episode in which appellant left her apartment in the middle of the night without telling anyone where she was going. At other times, she randomly visited her neighbors' apartments because she thought they were spying on her. In addition, each time appellant has been released in the past,[6] she has stopped taking her medications at some point thereafter, thus making it necessary to hospitalize her again. Her failure to take her medications, the doctor said, led directly to increased delusions and hence an increased risk of hurting herself. Dr. Dalkilic urged the court to make sure that appellant would be stable and show insight into her disease before releasing her, so that she would have the optimal chance of remaining in outpatient status. Consequently, Dr. Dalkilic concluded that the least restrictive alternative for appellant would be inpatient hospitalization—at least for "another four to six weeks, until we optimally stabilize her."

The court stated that Mental Health Rule 16 required appellant's outpatient commitment to be permanently revoked to keep her in the hospital until she was optimally stable. "To accomplish the things that need to be accomplished for her to be safe at this time," the court said, revocation of her outpatient status was necessary because "she's not stable enough at this time to be released to outpatient treatment." The court concluded that revocation was "the least restrictive alternative" for appellant and urged her to "work with the doctors" so that she could go "back home soon." Finally, the court emphasized that no alternative other than revocation had been offered or proposed by either party. In the written order which followed, the court declared that appellant "continues to suffer from a mental illness," exhibiting "multiple symptoms," and that she "is currently in need of inpatient psychiatric hospitalization for an indefinite period, which is the least restrictive treatment alternative treatment for [her]."

## II

Appellant argues that the evidence was insufficient to meet the "clear and convincing evidence" standard of D.C.Code § 21–548(a) (2005 Supp.), which must be met before a civilly committed outpatient

---

5. During the hearing, appellant interrupted Dr. Dalkilic's testimony several times to claim that she had no mental illness. She tried to make her point by walking out of the courtroom, saying, "Excuse me, Judge, may I be excused? ... Let me get my purse." She did not actually walk out, but a few minutes later, appellant claimed that she was currently in the hospital because a male nurse did not like her and got her "locked up for shopping at the Safeway."

6. According to Dr. Dalkilic, appellant had been previously hospitalized at least five times.

"may be transferred to a more restrictive treatment setting, including inpatient hospitalization."

■ Our standard of review is well settled. We must view the evidence "in the light most favorable to the government and give full weight to the factfinder's ability to weigh the evidence, determine the credibility of witnesses, and draw justifiable inferences." *Rose v. United States,* 535 A.2d 849, 850 (D.C.1987). When a case is heard by a judge sitting without a jury, as this one was, the judgment will not be overturned "unless it appears that the judgment is plainly wrong or without evidence to support it." D.C.Code § 17–305(a) (2001); *see, e.g., Mihas v. United States,* 618 A.2d 197, 200 (D.C.1992).

Cases such as this are governed by D.C.Code § 21–548, which provides in part:

(a) A person who has been committed under section 21–545 or section 21–545.01 and is receiving outpatient treatment may be transferred to a more restrictive treatment setting, including inpatient hospitalization . . . pursuant to a court order, after a hearing, upon the court finding, based upon clear and convincing evidence, that:

(1) The person who is committed has failed to comply with a material condition of his outpatient treatment and a more restrictive treatment alternative is required to prevent the person from injuring himself or others; or

(2) There has been a significant change in the mental illness of the person who is committed and a more restrictive treatment alternative is required to prevent the person from injuring himself or others.

Relying on this section,[7] appellant asserts that the trial court's conclusion that her outpatient status should be revoked was not supported by clear and convincing evidence We disagree.

Dr. Dalkilic testified that appellant had ceased taking her medication and seeing her psychiatrist. Either of these omissions, by itself, would be a violation of a material condition of her Outpatient Commitment Order (which is in the record); two such violations made the government's case doubly strong. The doctor's testimony was not rebutted; indeed, appellant presented no testimony at all. In addition, because appellant stopped taking her medication, her mental condition significantly worsened, which according to the doctor placed her at risk of injury to herself. This testimony likewise was not challenged or rebutted. Thus, under either subsection (1) or subsection (2) of section 21–548(a), appellant could lawfully be transferred to a more restrictive treatment setting if such treatment (1) was necessary to prevent appellant from injuring herself and (2) was the least restrictive treatment alternative that would prevent such injury. *See In re James,* 507 A.2d 155, 158 (D.C. 1986).

■ A trial court's revocation of outpatient commitment status resulting in inpatient hospitalization must be based on clear and convincing evidence that the patient would be "likely to injure herself . . . as a result of mental illness" if she were permitted to remain at liberty. *In re Gahan,* 531 A.2d 661, 664 (D.C.1987) (citations omitted). This court has "deliberately declined to overdefine the term 'injure.' 'The term . . . is sufficiently vague and the panoply of aberrant conduct requiring civil

**7.** Although this Code section in its present form did not take effect until April 2003, several months after appellant's hearing, this same language was in force at the time of the hearing under D.C. Law 14–131, a temporary amendment of section 21–548.

commitment sufficiently unforeseeable that our only guidance for judges is to require them to [apply the term] on a case by case basis, in the common law tradition.'" *Id.* (citing *In re Mendoza,* 433 A.2d 1069, 1072 (D.C.1981)). Though the term "injury" may suggest some element of danger, that danger need not be physical in nature, nor need it involve violence. *Gahan,* 531 A.2d at 664. "All that is required is that the subject be found likely, by reason of mental illness, to 'inadvertently place [her]self in a position of danger or ... to suffer harm.'" *Id.* at 664–665 (citation omitted). Furthermore, "[t]he appropriate inquiry ... is whether the subject is likely to injure herself in the future. This prediction does not depend on the individual having succeeded in causing injury to herself in the recent past." *Id.* at 666 (citation omitted).

In the instant case, the trial court applied the appropriate legal standard and found that the likelihood of self-injury was sufficient to justify involuntary hospitalization. There is sufficient evidence in the record to support this finding. Dr. Dalkilic, appellant's treating psychiatrist, testified that appellant was removed from the community and rehospitalized because she ceased taking her medication, which caused a significant alteration in her mental health: she had become delusional, paranoid, manic, agitated, irritable, and confused. Most alarming to Dr. Dalkilic was the fact that appellant was inadvertently exposing herself to a significant risk of injury when she acted on her delusions.[8] The delusions had caused appellant to leave her apartment in the middle of the night without informing anyone of her whereabouts, and to go about knocking on her neighbors' doors because she was under the impression that they were spying on her and plotting against her. In addition, because appellant was refusing to take her medication at the time she was rehospitalized, her mental condition would have worsened considerably, resulting in even more frequent and intense delusions had she not been returned to the hospital.

Appellant argues that knocking on neighbors' doors and leaving her apartment late at night are insufficient to justify the revocation of her outpatient status. Describing Dr. Dalkilic's view of the risks associated with acting on delusions as "speculative," appellant asserts that nothing she did before she was rehospitalized was any more dangerous than "any lawyer driving a car while thinking about a case, or crossing the street while engaged with a colleague and not paying attention to traffic." On a different record, such an argument might be somewhat persuasive. In this case, however, appellant presented no evidence to rebut Dr. Dalkilic's opinion that there was a risk of injury associated with acting on delusions. Furthermore, this court has made clear that the "risk of injury" requirement is easy to meet, and that the injury need not "be physical nor involve violence." *See Gahan,* 531 A.2d at 664. Dr. Dalkilic's opinion that outpatient status would result in increased frequency and severity of appellant's delusions (because she would cease taking her medication), when viewed in light of *Gahan,* was sufficient to enable the court to find a risk of injury that would justify revocation of her outpatient commitment.

Our decision in *In re Stokes,* 546 A.2d 356 (D.C.1988), does not require us to hold otherwise. In *Stokes,* as in this case, the trial court revoked an outpatient commitment, concluding that the patient's "condition remained unstable and [that] inpatient hospitalization was necessary." *Id.* at 359.

---

**8.** Dr. Dalkilic also testified that appellant's mental illness left her with impaired judgment and psychotic behavior that could expose her to possible injury.

A majority of this court reversed, but only on the ground that the trial court had "failed to make a finding that inpatient commitment was the least restrictive alternative treatment to Ms. Stokes." *Id.* at 364 (Rogers, J., concurring).[9] The present case is distinguishable because the trial judge here made an express finding that revocation was "the least restrictive alternative" which would "accomplish the things that need to be accomplished for [appellant] to be safe at this time." Both the principal opinion and the dissent in *Stokes* also discuss other issues at some length, but the actual holding of the court is a narrow one, as the concurring opinion makes clear.

At the hearing below, appellant's counsel raised the point that appellant was currently taking her medication, arguing that this fact should result in her immediate return to outpatient status. Dr. Dalkilic explained, however, that until appellant gained insight into her disease, which she only does when she is optimally stable, she would simply stop taking her medication the moment she was released from the hospital. The doctor said it was especially unlikely that appellant would continue to take her medication if she were released at that time because she was still delusional; she viewed the doctors and nurses with distrust, believing that they were trying to poison her. She even spoke out of turn at the hearing, stating that the reason for her hospitalization was that a nurse deceived her and had her locked up for shopping at a local supermarket. Additionally, appellant had a history of non-compliance with her treatment regimen, a fact which was certainly relevant to the issue of whether she would continue to take her medicine if released.

Dr. Dalkilic therefore concluded that until appellant was optimally stable, meaning that she would no longer be delusional and would be able to maintain her medicated state, she should not be restored to outpatient status, which would in all likelihood expose her to a risk of injury.[10] The court was certainly entitled to rely on the doctor's opinion in making its ruling. *See Addington v. Texas,* 441 U.S. 418, 429, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) ("Whether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the meaning of the facts *which must be interpreted by expert psychiatrists and psychologists*" (emphasis added)). Any suggestion that there would be no risk of injury to appellant if she were immediately released to outpatient status was suffi-

9. *Stokes* was decided by a divided court. One judge dissented because he was satisfied that the trial court, at least implicitly, had made the necessary finding. *See Stokes,* 546 A.2d at 364–366 (Belson, J., dissenting).

10. Because appellant's delusions were the result of her failure to take her medication, Dr. Dalkilic testified that the only way to avoid the risk of injury to herself would be to allow her to become optimally stable before granting her outpatient status:

> Q. [on direct examination] Doctor, at this point, what is the least restrictive treatment alternative available for Ms. Perruso?
> A. I think she still needs to be in the hospital maybe for another four to six weeks, until we optimally stabilize her medication and work out a plan. We hope that her insight will improve, so that we have a good chance when she leaves the hospital she would continue taking her medications.

> \* \* \* \* \* \*

> Q. [on cross-examination] Now, you said that Ms. Perruso, in your opinion, is not ready to return to the community, correct?
> A. Yes.
> Q. And you indicated that in your opinion she needs another four to six weeks of hospitalization, correct?
> A. Yes.

ciently refuted by the doctor's testimony, which went unrebutted at the hearing.

### III

■ The doctor's testimony established (1) that appellant violated a material condition of her outpatient treatment by failing to take her medication; (2) that there was, as a result, a significant change in her mental state; (3) that she was at risk of injuring herself because she tended to act on her delusions, which had increased in severity and frequency since she stopped taking her medication; and (4) that the only way to eliminate this risk of injury would be to treat her as an inpatient until she became optimally stable. We hold that this evidence was sufficient to establish that the least restrictive treatment alternative for appellant was inpatient commitment. The trial court's order is therefore

*Affirmed.*