*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 20-FM-0028

IN RE RASHAWN GASKINS, APPELLANT,

Appeal from the Superior Court of the
District of Columbia
(MHE1538-19)

(Hon. Peter A. Krauthamer, Motion Judge)

(Argued June 30, 2021                                     Decided December 30, 2021)

*Christine Pembroke* for appellant.

*Holly M. Johnson.*, Senior Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, *Caroline S. Van Zile*, Principal Deputy Solicitor General, and *Carl J. Schifferle*, Deputy Solicitor General, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, THOMPSON,[*] *Associate Judge*, and FISHER, *Senior Judge*.

---

[*] Judge Thompson was an Associate Judge of the court at the time of argument. Although her term expired on September 4, 2021, she will continue to serve as an Associate Judge until her successor is confirmed. *See* D.C. Code § 11-1502 (2012 Repl.). She was qualified and appointed on October 4, 2021, to perform judicial duties as a Senior Judge and will begin her service as a Senior Judge on a date to be determined after her successor is appointed and qualifies.

BLACKBURNE-RIGSBY, *Chief Judge*: This appeal comes to us from D.C. Superior Court's Family Court, Mental Health and Habilitation Branch. Appellant Rashawn Gaskins appeals the trial court's order of outpatient commitment, claiming evidentiary insufficiency. He argues that the evidence presented at trial did not, by clear and convincing means, demonstrate a likelihood that he would injure himself or others due to his mental illness. We disagree and affirm the outpatient commitment order.

## I.

In the summer of 2019, appellant was involuntarily committed to the Department of Behavioral Health's Comprehensive Psychiatric Emergency Program ("CPEP") on emergency applications on two occasions. On June 11, 2019, appellant made statements to White House Secret Service Officers about killing persons in order to defend himself. Then, on August 18, 2019, appellant made statements to a United States Capitol Police Officer about returning to the Capitol armed while Congress was in session.

One day after the second incident, the District of Columbia Office of Attorney General (the "District") filed in the Superior Court an emergency petition to continue

the involuntary detention of appellant under the Ervin Act. D.C. Code § 21-541, *et seq.* (2012 Repl.). The trial court ordered that appellant remain detained. Shortly after, an evidentiary hearing was held on August 22, 2019, where the trial court determined there was probable cause to remand appellant to the Department of Behavioral Health for emergency observation and diagnosis.

On August 25, 2019, the District filed a petition for commitment, asserting that while detained at the Department of Behavioral Health, appellant was examined by a psychiatrist, who provided the certified opinion that appellant was "mentally ill, and because of the illness, is likely to injure [him]self or others if not committed." The District of Columbia Commission on Mental Health (the "Mental Health Commission") held a hearing regarding the petition on September 12, 2019, and recommended outpatient commitment for one year, which, with the assistance of counsel, appellant initially accepted.[1]

A hearing before an associate judge of the Superior Court was then scheduled for September 25, 2019, to consider the Mental Health Commission's

---

[1] The Mental Health Commission recommended one year of outpatient treatment, which included that appellant would meet with a core service agency three to five times per week, would reside with a relative, and continue to take his medication.

recommendation. At the hearing, appellant through his counsel withdrew his acceptance of the recommendation, and the matter was set for a bench trial on December 17 and 18, 2019. At the bench trial the following evidence was presented by the parties.

On June 11, 2019, appellant quickly approached a White House vehicle entrance located on the corner of 15th Street and E Street, NW, where United States Secret Service Officers ("SSO") Zackry Everett and Timothy McCarthy were posted. Appellant testified, explaining that he approached the SSOs because he was assaulted by United States Marshals at the Superior Court earlier that day and wanted to complain or file charges against the Marshals with a federal agency.[2]

When appellant reached the White House perimeter, he began asking SSO McCarthy questions, initially asking whether the President actually lived at the

---

[2] Appellant recounted that at the Superior Court, he entered a courtroom to observe proceedings while wearing a hat. Upon entering, appellant was asked by the presiding judge to remove his hat. Appellant did not do so until a Marshal approached him and directed him to remove the hat. Appellant then observed another individual in the courtroom with something on their head and put his hat back on. The Marshal returned to appellant and "snatched" appellant's hat from his head and walked away. Appellant followed the Marshal, then the Marshal threw the hat to the ground, pulled out his taser, and began to push appellant. More individuals, a mix of Marshals and court security, became involved to remove appellant from the courthouse.

White House, then whether the area was secure. SSO McCarthy pressed appellant as to why he asked about security, and appellant responded he wanted to start killing people. Appellant testified, admitting that while speaking to the SSO at the White House he said, "if people are willing to threaten my life, then I have to defend my life." Both SSOs, McCarthy and Everett, testified that appellant was then detained and handcuffed without resistance. After being detained, appellant informed the SSOs that he was assaulted by United States Marshals and government officials and that he was being followed. Appellant was transported to the D.C. Department of Behavioral Health's CPEP without issue, and later released.

Two months later on August 18, 2019, appellant went to the United States Capitol and had an interaction with two United States Capitol Police Officers ("CPOs"). CPO Wayne Trautman was posted outside of the United States Capitol when appellant, approaching at a quickened pace, asked from approximately thirty feet away if there was a shift- or post-change.[3] CPO Trautman testified that appellant approached and proceeded to talk for approximately fifteen to twenty minutes, expressing his unhappiness with the state of the world. CPO Trautman asked appellant how he would go about fixing the world, and appellant responded in

---

[3] Appellant had been to the U.S. Capitol earlier that day and spoke to a different CPO, CPO Gimble.

a verbal and non-verbal manner. Appellant made a nonverbal shrugging motion, lifted his hands and said, "I don't know, maybe I return armed, . . . when Congress is in session," while motioning as if drawing a concealed handgun from his right hip.[4] Taking the statement about returning armed as a threat to Congress, CPO Trautman placed appellant in handcuffs without any issue.[5] CPO Frederick Hopkins arrived to observe, noting appellant was agitated, did not want to be handcuffed, and asked not to be detained and for the CPO not to "FD12" him.[6] Appellant was then transported and temporarily held for psychiatric examination by CPEP.[7]

Prior to trial, CPO Trautman also testified at appellant's August 22, 2019, probable cause hearing, in which the trial court determined there was cause to

---

[4] At trial, appellant disputed CPO Trautman's testimony that he stated he would return to the Capitol armed, stating he merely talked about how old traditions are the problem and that younger children should be influenced by a different philosophy.

[5] After the detention, appellant expressed concerns that his phone was being "tapped."

[6] "FD12" refers to Form FD-12, an "Application for Emergency Hospitalization by a Physician or Psychologist of the Person, Officer or Agent of D.C. Department of Behavioral Health or an Officer Authorized to Make Arrests."

[7] At trial, appellant for the most part confirmed the event and statements made at the White House in June of 2019 and the United States Capitol in August of 2019, except as explicitly distinguished.

remand appellant to the Department of Behavioral Health for emergency observation and diagnosis. At trial, CPO Trautman testified that as appellant exited the courtroom following the probable cause hearing, he looked at CPO Trautman and said something to the effect of "I don't know how much money you make . . . but I am coming for you." CPO Trautman did not know if appellant was making a physical threat or a threat to take legal action. When asked about his statement to CPO Trautman, appellant stated he intended to seek civil remedies because CPO Trautman committed perjury and violated his "oath." Then, in October of 2019, CPO Trautman received a call from former co-workers that appellant had returned to the United States Capitol.[8]

In addition to the testimony of the SSOs and CPOs, the trial court heard testimony from Dr. Constantine Shustikoff, an attending psychiatrist with the Psychiatric Institute of Washington (PIW), who observed and diagnosed appellant. Dr. Shustikoff met with appellant approximately five times per week over the course of six weeks (while appellant testified that Dr. Shustikoff only met with him once). Dr. Shustikoff diagnosed appellant with "bipolar one disorder, severe with psychotic

---

[8] CPO Hopkins also testified at trial that appellant returned to the United States Capitol approximately one month earlier, November 2019. It is unclear whether this is the same October 2019 visit, when CPO Trautman was notified, or if it is an additional visit.

features," his most recent episode being "manic." According to Dr. Shustikoff, appellant showed symptoms of "distinct, abnormal, expansive mood that was pretty persistent; grandiosity; the rapid speech and being very, very talkative; also the flight of ideas." Dr. Shustikoff indicated that appellant did not talk about hurting anyone when they met and specifically denied the allegations against him.

With regard to appellant's behavior at PIW, Dr. Shustikoff informed the court that appellant repeatedly refused to take medication, only voluntarily taking the prescribed medication once. She also informed the court that after being discharged from PIW, appellant did not follow through with voluntarily taking medication. Dr. Shustikoff recalled one incident, in September of 2019, where an emergency code was called for appellant because he was frustrated with being at PIW and became agitated and aggressive.

Dr. Shustikoff testified that two-thirds of bipolar patients will have another episode of mania or depression with similar symptoms. Dr. Shustikoff testified if appellant's mental illness were to become unstable, symptoms would include "abnormal mood, usually expansive or irritable, increase in energy, impulsivity, grandiosity," and he would likely engage in similar behavior — approaching law enforcement and making threats. Dr. Shustikoff expressed concern for appellant's

safety and the safety of others because appellant was not following medical recommendations and because of "the severity of the behaviors and threats that happened during his last admission."

The trial court concluded there was clear and convincing evidence that appellant suffered from "bipolar [one] disorder and manic episodes".  Appellant's refusal to engage in any treatment for his mental illness, coupled with his "obsessive behavior to go to federal law enforcement agencies and personnel and continually engage in conversations with them and say very, very odd things," rose to a level of likelihood of injury to himself or others.  The court highlighted that appellant talked about killing people or returning armed when Congress was in session to fix the world, commending the federal officers who defused the situation in a professional manner, suggesting other officers may not have exhibited such control.  The court also noted that appellant was locked into the idea of doing harm to others as a means to save the world.  As the least restrictive alternative to inpatient commitment, the trial court ordered one year of outpatient commitment.  This appeal followed.

## II.

On appeal, appellant does not challenge his diagnosis or that his behavior is caused by his mental illness; rather, he argues evidentiary insufficiency to support the likelihood that he would injure himself or others. "In examining a claim of insufficiency, the applicable standard of review is 'whether there is any substantial evidence which will support the conclusion reached by the trier of fact below.'" *In re Artis*, 615 A.2d 1148, 1152 (D.C. 1992) (quoting *Boynton v. Lopez*, 473 A.2d 375, 376 (D.C. 1984)). This court "must view the evidence in the light most favorable to the government and give full weight to the factfinder's ability to weigh the evidence, determine the credibility of witnesses, and draw justifiable inferences." *In re Perruso*, 896 A.2d 255, 259 (D.C. 2006) (quotation omitted). "When a case is heard by a judge sitting without a jury . . . the judgment will not be overturned 'unless it appears that the judgment is plainly wrong or without evidence to support it.'" *Perruso*, 896 A.2d at 259 (quoting D.C. Code § 17-305(a) (2012 Repl.)).

Civil commitment is governed by the Ervin Act, and in order to involuntarily commit an individual the record must demonstrate by clear and convincing evidence that "the person is mentally ill and, because of that mental illness, is likely to injure himself or others if not committed." D.C. Code § 21-545(b)(2) (2012 Repl.);

*Addington v. Texas*, 441 U.S. 418, 425-26, 431-32 (1979) (holding that due to the liberty interests at stake, there must be clear and convincing evidence to order an involuntary civil commitment, which is a standard higher than the preponderance standard); *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984) (defining clear and convincing as the truth of factual contentions to be "highly probable" or substantially more likely to be true than untrue); *see In re Nelson*, 408 A.2d 1233, 1238 (D.C. 1979) (replacing the District of Columbia's proof beyond a reasonable doubt standard applicable to involuntary civil commitments with the clear and convincing standard announced in *Addington*); *see also Tilley v. United States*, 238 A.3d 961, 973-74 (D.C. 2020). "[I]t is necessary for the government to prove that the individual suffers from a mental illness and that the danger-productive behavior of the individual results from the mental illness." *In re Stokes*, 546 A.2d 356, 363 (D.C. 1988) (citation omitted).

Here, the trial court's conclusion — that appellant was mentally ill and because of his illness and refusal to be treated, he was likely to injure himself or others — was neither plainly wrong nor without substantial evidentiary support. On appeal, appellant argues that the record lacks clear and convincing evidence he was likely to injure himself or others by acting on his statements because (1) his behavior did not result in actual injury to himself or others; and (2) he has no history of

conduct resulting in injury.  Appellant's argument is premised on the likelihood of physical injury.  However, this court has "deliberately declined to over define the term 'injure;'" where "'injure' connotes an element of danger, the danger need not necessarily be physical nor involve violence." *In re Gahan*, 531 A.2d 661, 664 (D.C. 1987); *In re Mendoza*, 433 A.2d 1069, 1071-72 (D.C. 1981) (while in hospital the patient made various threats and experienced episodes of violence); *In re Bumper*, 441 A.2d 975, 978 (D.C. 1982) (holding that "injury" includes unintentional injury and injury resulting from nonviolent acts); *In re Snowden*, 423 A.2d 188, 191-92 (D.C. 1980) (declining to adopt the "recent overt act" test, which would help indicate future dangerousness; instead concluding that appellant's being threatening was enough to find a likelihood to injure self or others).  All that is required is that the subject be found likely, by reason of mental illness, to "inadvertently place himself in a position of danger or . . . to suffer harm." *Snowden*, 423 A.2d at 191.

The recommendation for outpatient commitment was supported by substantial evidence that appellant would place himself or others in a position of danger as demonstrated by his continued refusal to engage in treatment for his mental illness and his patterned behavior of approaching law enforcement and making threats. While at PIW appellant voluntarily took his prescribed medication on one occasion and after discharge did not follow through with medication.  Dr. Shustikoff testified

that two-thirds of persons diagnosed with appellant's mental illness, bipolar disorder, would experience a future episode; and there was a high risk appellant would engage in similar behavior — approaching law enforcement and making threats — during another episode. *See Mendoza*, 433 A.2d at 1072 (concluding involuntary "commitment is partly based on a prediction of future conduct"). Dr. Shustikoff also expressed concern for appellant's safety and the safety of others because appellant was not open to or willing to abide by medical recommendations, and due to "the severity of the behaviors and threats that happened during his last admission."

Appellant's past behavior strongly validates an inference that he will continue to engage with law enforcement and make threatening statements. Within two months appellant engaged with two federal law enforcement entities, Secret Service and Capitol Police, both resulting in appellant's detention for making threats to physically harm others. Furthermore, even after being detained and committed for mental health treatment, appellant returned to the Capitol, at which time, CPOs notified CPO Trautman that appellant had returned. We can surmise that CPO Trautman was notified because appellant threatened to "come after" him at the probable cause commitment hearing. We conclude that there was sufficient evidence to support the determination that appellant's mental illness, for which he

failed to abide by prescribed treatment, and the conduct which led to his detentions established the clear and convincing evidence that appellant was likely to injure himself or others.

Appellant also asserts that he was able to bring his concerning behavior into control without civil commitment in the months before trial; therefore, civil commitment is not necessary. However, there is no limitation placed on the medical history the trial court may consider in assessing appellant's mental health and potential to injure. *Gahan*, 531 A.2d at 666 (stating "[w]e are unwilling to establish a per se rule limiting the extent of an individual's medical history which a trial court may consider"). This court has also repeatedly rejected the suggestion that there must be a recent overt act indicating future dangerousness to order commitment. *Perruso*, 896 A.2d at 260; *Gahan*, 531 A.2d at 666; *Snowden*, 423 A.2d at 191-92. [9]

---

[9] On appeal appellant also asserts that his mental illness is so apparent and recognizable to law enforcement and ordinary people that special accommodations would be made for him to prevent injury. However, this argument is not persuasive, where the evidence demonstrated that appellant's illness was not immediately apparent to some officers.

## III.

We affirm the trial court's decision to order one year of outpatient commitment, as appellant was mentally ill with bipolar disorder and because of his mental illness was likely to injure himself or others.

*So ordered.*