**In re Lydia ARTIS, Appellant.**

**No. 88–FM–1339.**

District of Columbia Court of Appeals.

Argued Oct. 6, 1992.
Decided Dec. 28, 1992.

---

S. Pamela Thomas, Public Defender Service, with whom James Klein and Laurie B. Davis, Public Defender Service, were on the brief, for appellant.

Sheila Kaplan, Asst. Corp. Counsel, with whom John Payton, Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Ann O'Regan Keary, Deputy Corp. Counsel at the time the brief was filed, were on the brief, for the District of Columbia.

Before STEADMAN and KING, Associate Judges, and PRYOR, Senior Judge.

PRYOR, Senior Judge:

Lydia Artis appeals her civil commitment to D.C. Village Nursing Home after a unanimous jury found her to be mentally ill and likely to injure herself if allowed to remain at liberty. D.C.Code § 21–545(b) (1981) ("Ervin Act"). Appellant maintains on appeal that (1) the evidence adduced at trial was insufficient to support the jury's determination; (2) the government counsel's single mention during *voir dire* that the jury was "to determine whether Lydia Artis required further treatment" constituted reversible error; and (3) by choosing a nursing home for appellant, the trial court failed (a) to choose the "least restrictive alternative" available, and (b) to issue explicit findings supporting his decision. We find no error and affirm.

I.

On January 8, 1987, appellant was admitted to Saint Elizabeths Hospital pursuant to application by Dr. Robert Keisling, the director of the District of Columbia's emergency mental health services program at the time. D.C.Code § 21–521 (1981). The following day, appellee successfully petitioned the court seeking to extend appellant's emergency hospitalization. Four days later, the Superintendent of the Hospital's timely petition seeking appellant's continued hospitalization for seven more days was granted after an *ex parte* hearing. D.C.Code § 21–523 (1981). Subsequently, in accordance with D.C.Code § 21–541 (1981), the Superintendent filed a petition for appellant's judicial hospitalization. A hearing was convened before the Superior Court's Commission on Mental Health. The Commission found appellant suffering from Bipolar Affective Disorder—Manic, delusions, and impaired memory, judgment and insight. They concluded that she was likely to injure herself if allowed to remain at liberty and recommended placement in a nursing home, where she could receive necessary daily supervision. When these recommendations were filed with the trial court, appellant requested and was granted a jury trial. D.C.Code § 21–545 (1981).

*The Evidence at Trial*

The hospital presented three witnesses: Constance Laurent–Roy, Vice President for Clinical Affairs and Director of Residential Programs, JMC Associates; Mary Cromartie, R.N., Saint Elizabeths Hospital; and Dr. Toledo, appellant's treating psychiatrist at Saint Elizabeths.

Ms. Laurent–Roy testified that in October 1986, upon referral from the Crisis Resolution Branch at D.C. General Hospital, appellant had been accepted into the residential crisis bed program of JMC Associates. Placement in the JMC Euclid Residence was triggered by appellant's eviction from her home following foreclosure proceedings. Based upon daily contact with appellant, Ms. Laurent–Roy related that the JMC program could not accommodate appellant for more than a few weeks due to her physical and mental circumstance. In particular, appellant exhibited chronic incontinence; refused to maintain a diet necessary to control her elevated blood pressure and diabetes; and was either incapable or unwilling to self-administer her medication. As a result, on December 18, 1986, Ms. Laurent–Roy personally returned appellant to the Crisis Resolution

Branch at D.C. General, from where she was subsequently transferred to Saint Elizabeths.

Mary Cromartie, a nurse for thirty years, has been employed at Saint Elizabeths since 1976. Based on numerous encounters with appellant, she maintained that appellant was unable to care for herself, citing severe personal hygiene problems centering around appellant's incontinence. Ms. Cromartie opined that appellant's refusal to bathe aggravated her diabetic condition, increasing her susceptibility to infection. As a result, the hospital staff was often forced to bathe her. Consistent with previous testimony, Ms. Cromartie affirmed that appellant refused to self-administer her prescribed insulin despite several attempts at instruction by hospital staff.

Finally, Dr. Amanda Toledo, upon being qualified without objection as an expert in the treatment and diagnosis of mental illness, testified that appellant suffered from Bipolar Disorder, Manic, and exhibited symptoms such as increased psychomotor activity, pressure of speech, flight of ideas, paranoid thoughts, and delusions. Based on her review of the record, Dr. Toledo described appellant's living conditions prior to her present commitment as being without heat or electricity and with evidence of Ms. Artis' incontinence everywhere. Of particular note, Dr. Toledo testified to appellant's failure to appreciate the potentially fatal consequences of her diabetic condition if untreated. Dr. Toledo concluded that appellant was a danger to herself as a result of her mental illness, resulting from her inability to regularly take her required medicine and care for her personal hygiene—conditions further exacerbated by appellant being homeless and without family upon whom to rely.

Ms. Artis was the sole witness in her own behalf. During her testimony, she maintained, *inter alia*, that she was a doctor of medicine as well as the past Superintendent of Saint Elizabeths during the late 1930s, all of which is refuted by public records. Upon cross-examination, she revealed that for some time her home had neither heat nor electricity and despite the

foreclosure proceedings precipitating her eviction, she intended to return there upon her release.

After appropriate instructions, the jury found there was clear and convincing evidence that Ms. Artis was mentally ill and likely to injure herself.

*The Disposition Hearing*

On January 13–14, 1988, an evidentiary hearing was conducted pursuant to D.C.Code § 21–545(b) (1981), and Super.Ct.Ment.H.R. 6(a). Dr. Betsy Cooper, a psychiatrist at Saint Elizabeth's Long–Term Program who treated appellant from August 1987 to the time of the hearing, described appellant's mental condition as delusional and unrealistic about her condition, and found that her insulin-dependent diabetes, hypertension, anemia, cataracts, obesity, urinary incontinence and infections should be supervised by the hospital. In particular, Dr. Cooper recommended hospitalization to properly care for appellant's mental and physical condition. Regarding less restrictive alternatives, she emphasized that appellant suffered from a variety of ailments requiring "different types of intervention and different types of follow-up" which she was unlikely to receive outside the structured setting of a hospital. It was her opinion, that outside a hospital environment, appellant would not have the required access to necessary medical and psychiatric care; this lack of access would only be aggravated by appellant's demonstrated reluctance to regularly take her medicine.

Dr. Maureen Polsby testified on appellant's behalf. Relying on her review of the record and a single interview with appellant, and notwithstanding that she never conferred directly with appellant's treating psychiatrists, Dr. Polsby testified that appellant was capable of independent living with visiting-nursing supervision, and was capable of learning to self-administer her needed medication.

At the conclusion of the hearing, appellant requested, and the court granted, the opportunity to present additional evidence of alternative commitment locations. On June 10, 1988, Ms. Sheryl Jones, a social

worker with the Public Defender Service, Mental Health Division, testified that appellant was an eligible candidate for a planned outpatient program, the Evergreen Complex Program, which would offer her an opportunity for monitored independent living. Requesting more information, the court reconvened on June 29 to hear further testimony about the proposed facility. On September 9, 1988, the court, by signed order, adopted the recommendation of the Mental Health Commission committing appellant to a nursing home facility.

## II.

■ A civil commitment proceeding spotlights the mental condition of the appellant at the time of the hearing. At the proceeding, the factfinder's role is to determine whether clear and convincing evidence shows that the person before it is currently mentally ill and likely to injure herself or others if allowed to remain at liberty. *See Foucha v. Louisiana,* — U.S. —, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992); *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); *In re Gahan,* 531 A.2d 661, 664 (D.C.1987); *In re Samuels,* 507 A.2d 150, 152 (D.C.1986); *In re Mendoza,* 433 A.2d 1069, 1070–71 (D.C.1981); *In re Nelson,* 408 A.2d 1233, 1238 (D.C.1979). To rise to the level of appropriate "injury," all that is required is that the subject be prone to "inadvertently place [her]self in a position of danger or ... to suffer harm." *In re Snowden,* 423 A.2d 188, 191 (D.C. 1980).[1]

■ Appellant maintains that the trial court erred by repeatedly admitting both hearsay and lay opinion testimony. She argues that if this tainted evidence is segregated from that which was properly admitted, the resulting sum is insufficient to support the jury's findings. Appellant initially challenges the ability of Dr. Toledo, as a psychiatrist, to accurately predict whether appellant would injure herself in

the future. This argument that psychiatrists, as a professional group, lack the expertise to forecast dangerousness has been squarely foreclosed by our recent decision in *In re Melton,* 597 A.2d 892 (D.C. 1991). There, we held that "[a] trained psychiatrist must surely be qualified, *a fortiori,* to assess [a patient's] dangerousness to himself or others, especially where, as here, that assessment is based on the patient's need for medication and his failure in the past to take it with the requisite regularity." *Id.* at 899. By way of emphasis, we noted that "[i]n asking us to divide psychiatrists into those who are experts on dangerousness and those who are not, [appellant] places 'too much focus on a [purported] specialty and too little focus upon the [facts] alleged.' " *Id.* at 900 n. 9, (quoting *Ornoff v. Kuhn and Kogan Chartered,* 549 A.2d 728, 731 (D.C.1989)).

Secondly, appellant questions Dr. Toledo's testimonial reliance on hospital records and general out-of-court statements and materials. Admittedly hearsay, we defer to the well-settled proposition that expert opinions may be properly based on information such as medical charts, transfer memoranda, etc. This position comports with the Advisory Committee's Notes to Federal Rule 703 which states that

> a physician in his [or her] own practice bases his [or her] diagnosis on information from numerous sources and of considerable variety, including ... reports and opinions from nurses, technicians, and other doctors, hospital records.... His [or her] validation, expertly performed and subject to cross examination, ought to suffice for judicial purposes.

*See In re Melton,* 597 A.2d 892, 903–06 (D.C.1991).

Thirdly, appellant takes issue with government counsel's failure to elicit a specific finding that the hospital records employed at trial by Dr. Toledo were of the kind "customarily relied on by similar experts." *See* Federal Rule 703. In *Melton,* we visit-

---

**1.** Appellant's contention that "[s]imply because there are concerns that a person might not be able to care for herself is not enough to demonstrate by clear and convincing evidence that she is likely to injure herself," misstates the law. It

is *precisely* the union of mental illness with the inability of a person to adequately care for herself that raises the inference of "danger" and "injury" to self and triggers the statutory provisions. *See In re Gahan, supra,* 531 A.2d at 666.

ed this precise issue and held that "in spite of the trial judge's failure to make an explicit finding on the question on which the admission of the contested evidence depended, [we are persuaded] that the drafters of [Federal Rule 703] viewed psychiatric reliance on information provided by family members and hospital records as reliable in principle." *Melton, supra,* 597 A.2d at 908.[2]

Finally, appellant finds fault with the opinion and hearsay testimony of the nurse, Ms. Cromartie.[3] After failing to object during direct examination and choosing not to cross-examine, appellant now urges that these admissions constituted reversible error. The government rejoins, and we agree, that since appellant failed to make a timely objection during trial, she is confronted with a body of law limiting our consideration. In *Harris v. United States,* 602 A.2d 154, 159 (D.C.1992), we held that "reversal under the plain error doctrine is justified only in exceptional circumstances where a miscarriage of justice would otherwise result. Stated otherwise, errors complained of must be so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." (Citations omitted). Applied to the present situation, the trial court gave due consideration to the lengthy tenure of the witness and appropriately instructed the jury on weighing the testimony of lay witnesses. Given this instruction, coupled with counsel's failure to object, we find no reversible error.

In examining a claim of insufficiency, the applicable standard of review is "whether there is any substantial evidence which will support the conclusion reached by the trier of fact below." *Boynton v. Lopez,* 473 A.2d 375, 376 (D.C.1984) (quoting *Hart v. Cherner,* 178 A.2d 919, 920 (D.C.1962)). Here, the record amply supports the jury's decision that appellant was both mentally ill and likely to injure herself. The testimony of all three government witnesses consistently echoed appellant's unrefuted history of mental illness; her inability—or refusal—to maintain a needed regimen of daily medication; an alarming disregard for personal hygiene; and an apparent incapacity to appreciate the potentially fatal implications of her conditions.

### III.

■ During *voir dire,* the government advised the prospective panel of jurors: "you're going to be asked to decide whether Lydia Artis in this case should have further treatment or whether she must be immediately released if she so desired." Appellant urges that this statement improperly deflected the panel's attention from their limited statutory duty—determining mental illness and dangerousness—to the improper consideration of further treatment—the sole province of the trial court. Moreover, appellant maintains this assertion so polluted the entire proceedings that it was not mitigated by numerous subsequent instructions from both the bench and counsel. While appellant is correct that counsel's remark does misstate the specific function of a civil commitment jury, we held in *In re Bumper,* 441 A.2d 975 (D.C.1982), that it was not reversible error for a court to instruct the jury on alternative treatments in an effort to illuminate the panel's understanding of the proceedings. In fact, we commended this reference "to be consistent with the broader responsibility of the jury in civil commitment proceedings...." Even assuming error, in light of the judge's closing instructions correctly advising them of their statutory duty, and the fact that counsel's remark was only mentioned once before the jury was impaneled, we find it harmless.

---

2. In addition, any reference to those records by the government in closing remarks—absent a cautionary instruction by the trial court—was harmless error, considering they were not "inherently inadmissible but could have been offered under the business records exception to the hearsay rule." *In re Samuels,* 507 A.2d 150, 154 (D.C.1986).

3. Appellant focuses primarily on Ms. Cromartie's opinion that appellant's poor hygiene had a particularly deleterious effect on her diabetic condition; and that she did not personally witness some of the incidents she describes.

## IV.

Finally, during the dispositional phase, the court was presented with three alternatives: (1) inpatient psychiatric hospitalization, recommended by the hospital; (2) nursing home commitment, recommended by the Mental Health Commission; and (3) community living with assistance and supervision, recommended by Ms. Artis. The court decided that Ms. Artis' circumstance would benefit most by placement in a nursing home. Appellant counters that this decision does not conform with this jurisdiction's mandate that the trial court choose the "least restrictive alternative which would serve the purposes of commitment." *In re Stokes*, 546 A.2d 356, 360 (D.C.1988). While theoretically correct, appellant misreads the law by choosing to emphasize the first part of the phrase to the exclusion of the latter. In deciding what best "serve[s] the purposes of commitment," the court has before it "the entire spectrum of services ... available, including outpatient treatment, foster care halfway houses, day hospitals, nursing homes, etc." *Lake v. Cameron*, 364 F.2d 657, 659–60, 124 U.S.App.D.C. 264, 266 (1966). In the case before us, the trial court held extensive evidentiary hearings eliciting testimony regarding treatment alternatives. It was only after "explor[ing] alternatives within the hospital, *Covington v. Harris*, 419 F.2d 617, 623 (1969), and outside the hospital, *Lake v. Cameron, supra*," that the judge rendered his decision to commit appellant to a nursing home. *In re Mills*, 467 A.2d 971, 975 (D.C.1983).

The trial court's failure to enunciate findings of fact that nursing home commitment was the least restrictive form of treatment is of no particular moment. Super.Ct. Ment.H.R. 5(c) provides in pertinent part:

If trial is by the court, the court shall make a general finding as to whether the respondent is mentally ill or, if so, whether because of that illness he is likely to injure himself or other persons if allowed to remain at liberty. *Upon request of a party*, the court shall in addition find the facts specifically, except that findings of fact with respect to disposition and future treatment shall be made at the disposition hearing.

(Emphasis supplied). The record before us reveals no instance where appellant requested any particularized findings from the court.[4] Appellant misapplies our decisions in *In re Stokes*, 546 A.2d 356 (D.C. 1988), and *In re James*, 507 A.2d 155 (D.C. 1986), as standing for the proposition that an explicit finding is required in all civil commitment proceedings. In those cases, we considered the *revocation* of an outpatient commitment and noted our discomfort with a trial court's adopting a patient's diagnosis of mental illness and propensity for injury from a prior adjudication without making an explicit finding of least restriction.[5] *See In re Mills, supra*, 467 A.2d at 975. In the case before us, the trial court was not interpreting a prior decree, but rather made a *de novo* determination following a jury trial and dispositional hearing over which he presided. Accordingly, we find no error.

*So ordered.*

---

4. In fact, the record does reveal that the trial court, *sua sponte*, verbalized concern regarding its authority to place appellant in the Evergreen facility before they officially opened, and prior to appellant being officially accepted into the program. Moreover, the court explicitly emphasized that its role was to determine the least restrictive type of placement under the circumstances.

5. In revoking outpatient commitment, the trial judge ... made comments indicating his perception that the obligation to consider less restrictive alternatives was the duty of the original committing court, but that it was not necessary for him to undertake a search for a less restrictive treatment at the outpatient revocation stage. This construction, of course, runs counter to the underlying purpose of the Act.

*In re Stokes, supra*, 546 A.2d at 360.