*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-FM-0498

IN RE D.D., APPELLANT.

Appeal from the Superior Court
of the District of Columbia
(2021-MHE-001820)

(Hon. Darlene M. Soltys, Trial Judge)

(Argued May 16, 2023                    Decided October 4, 2023[*])

*Jennifer Williams*, Public Defender Service, with whom *Samia Fam* and *Shilpa S. Satoskar*, Public Defender Service, were on the brief, for appellant.

*Eric M. Levine*, Assistant Attorney General, for appellee. *Brian L. Schwalb*, Attorney General for the District of Columbia, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *Thais-Lyn Trayer*, Deputy Solicitor General, were on the brief for appellee.

Before BECKWITH and HOWARD, *Associate Judges*, and THOMPSON, *Senior Judge.*

---

[*] The decision in this case was originally issued as an unpublished Memorandum Opinion and Judgment. It is now being published upon the court's grant of appellant's motion to publish.

THOMPSON, *Senior Judge*: This matter is an appeal from an order authorizing involuntary civil commitment. Appellant D.D. is an 80-year-old woman who has been diagnosed with schizoaffective disorder, bipolar type. At the time of briefing and oral argument before this court, she remained an inpatient resident of Saint Elizabeths Hospital (the "Hospital"), a psychiatric hospital operated by the District of Columbia (the "District") Department of Behavioral Health ("DBH"). After a bench trial in June 2022, the Superior Court found that D.D. was mentally ill, that her mental illness put her at risk of injuring herself, and that inpatient commitment was the least restrictive alternative in the best interests of D.D. and the public, and issued a written order on June 8, 2022, committing D.D. to DBH, for a period of one year, for inpatient treatment.[1] *See* D.C. Code § 21-545. On appeal, D.D. (who has remained at the Hospital on a voluntary basis following the expiration of the commitment order[2]) contends that the court based its determinations and order on

---

[1] The order contemplates, however, that D.D. might be "discharged from the inpatient treatment to participate in an outpatient course of treatment" and directs that if she "subsequently fails to abide by the treatment regimen or if [her] mental condition . . . deteriorates, [she] may be returned to inpatient hospitalization."

[2] D.D. has delusions about Mitt Romney and reportedly believes that he is arranging other housing for her. She has remained at St. Elizabeths awaiting that assistance, and she has rejected a housing alternative arranged by her court-appointed guardian.

insufficient evidence.[3] Although we are not persuaded by all of D.D.'s arguments, we are concerned that the Superior Court ruled without awaiting what appears to have been then soon-to-be available information about D.D.'s possible neurological or neurocognitive condition, and we also are persuaded that the court (and the District) did not adequately explore less restrictive alternatives to acute inpatient commitment of D.D. We therefore vacate the commitment order insofar as it mandated inpatient commitment.[4]

## I. The Evidence at Trial

The District's chief witness at trial was Dr. Syed Zaidi, a psychiatrist at the Hospital, who at the time of trial had been D.D.'s attending psychiatrist for nearly

---

[3] The trial testimony established that D.D. is "in denial of her mental illness," but her briefs on appeal do not explicitly deny that she has a mental illness and do not appear to challenge the trial court's determination that she is mentally ill.

[4] The trial court's commitment order expired on June 8, 2023. D.D.'s history of emergency hospitalizations creates "a reasonable expectation that the same complaining party would be subject to the same action again," *In re Morris*, 482 A.2d 369, 372 (D.C. 1984) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)), and the one-year limitation on the length of commitment orders, *see* D.C. Code § 21-545(b)(2), means that "the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration," *Morris*, 482 A.2d at 372 (quoting *Weinstein*, 423 U.S. at 149). D.D.'s claim is thus "capable of repetition yet evading review," and we are satisfied (and agree with the District) that her appeal is not moot. *Id.* (quoting *United States v. Edwards*, 430 A.2d 1321, 1324 n.2 (D.C. 1981) (en banc)).

two years.[5]  Without objection, the court accepted Dr. Zaidi as an expert in the treatment and diagnosis of mental illnesses.  Dr. Zaidi summarized D.D.'s symptoms of schizoaffective disorder bipolar type, stating that she displays "[i]rritability"; is "psychotic," "delusional," and "easily . . . agitated," and has exhibited behavior that includes shouting vulgarities at other patients and calling them "prostitute[es]," "homosexual[s]," or other names.[6]  Dr. Zaidi also described that D.D. has been verbally aggressive toward other patients; referring to D.D.'s Hospital record, he recounted that another patient pushed D.D. after D.D. was "intrusive" towards her.  Dr. Zaidi further testified that D.D. has said that she will not take her psychotropic medication if she is released from the Hospital.  He opined that if she does not take her psychotropic medication, her delusions will become more intense and her aggressiveness more physical, and she will be "confused, agitated, [and] disorganized."  Dr. Zaidi also opined that if D.D. does

---

[5] Dr. Zaidi began treating D.D. on January 9, 2020, before taking medical leave from late March 2020 through the end of that year.  He resumed his role as D.D.'s psychiatrist in January 2021 and continued in that capacity through trial.  Before testifying, he reviewed D.D.'s hospitalization, admission, and incident-report records and spoke to her case manager.

[6] Dr. Zaidi recounted that D.D. has "threaten[ed]" to harm him "every single time" he has asked to perform a full evaluation of her.

not take her psychiatric medication—an injectable form of Abilify,[7] which Hospital staff administer to her every four weeks, and which they sometimes have been able to administer only by applying physical restraint as authorized by D.D.'s guardian—she will not take her medication for hypertension. Dr. Zaidi testified that the effect of forgoing her medication for hypertension "is going to be stroke, heart attack, kidney failure, blindness," and other health issues.

Dr. Zaidi explained that he had originally recommended outpatient treatment for D.D., but changed his mind upon being informed that providers of outpatient services cannot administer the involuntary injections. He dismissed the possibility that group homes would be better equipped for the task because "it becomes very[,] very difficult"; the Hospital always has backup staff to assist, which he "guess[ed]" would not be the case in a group home.

Jessica Bassil, a social worker at the Hospital since 2012, testified that she speaks with D.D. every day and that D.D. "is more disorganized and more verbally aggressive when she's not on medication." Ms. Bassil has been able to tell when D.D. is not adhering to her medications because of her demeanor: yelling, being disruptive, and waving her arms while turning red in the face. Ms. Bassil testified

---

[7] Dr. Zaidi testified that D.D. did not want to take oral medication, and she was tried on a different, less effective, injectable medication before her treatment team settled on the long-term injectable form of Abilify.

that D.D. seeks out medical treatment when she thinks she needs it, but told the court that D.D. is very critical of psychiatry, is very adamantly against psychiatric treatment, and does not believe in psychotropic medications, which she calls "snake oil."[8]  Ms. Bassil acknowledged, however, that D.D. had "largely been compliant" with taking her injections because she understands that if she does not adhere to the psychotropic medications, the Hospital will not consider her for discharge.  Ms. Bassil also described D.D. as having trouble remembering recent events.[9]

Nurse Stella Okeke testified that D.D. is verbally abusive toward her fellow patients when she interacts with them.  She described D.D.'s insults and vulgar outbursts directed at fellow patients (and at staff who intervene), which may be occasioned by, for example, another patient bumping into her slightly while standing in line.  Ms. Okeke also described what has occurred when D.D. resists injection of her psychotropic medication: D.D. "threaten[ed] to shoot and take people down and things like that," was angry and "foaming at the mouth," was

---

[8] D.D. is also concerned about the weight-gain side effect from her psychotropic medication and the cost of the (expensive) medication.

[9] Ms. Bassil testified that D.D. "does not recall any of the hearings that she participated in," even when reviewing transcripts of the proceedings.  She has forgotten about scheduled meetings even when reminded earlier in the day and has "often" requested and received office supplies, forgotten they had been provided, and requested them again.

looking as if "her eyes [were] popping out," and was "shaking" and "really upset," such that "you can see her vein." Her blood pressure was "dangerous," "almost 200 over something." Ms. Okeke testified that "[i]t doesn't really take D.D.[] anything to get frustrated."

Other witnesses described D.D.'s symptoms and behavior that precipitated her inpatient admissions. Azalech Tegene, a member of the DBH Community Response Team ("CRT"), testified about the events that led to D.D.'s first emergency hospitalization, which lasted from May 23 to September 24, 2018, after she was "FD 12'd" on May 8, 2018.[10] On that day, a women's shelter where she had been living for several months summoned the CRT for the second time in roughly two weeks because of her "extremely agitated" behavior. Ms. Tegene arrived to find D.D. "cursing[,] . . . yelling, [and] screaming," calling the security guards "homosexuals[,] . . . bitches and whores and so forth." A shelter representative expressed concern that shelter staff, most of whom are African Americans, might retaliate because D.D. was "provocative." (The trial court sustained a hearsay objection to Ms. Tegene's testimony about D.D.'s specific language, but let stand Ms. Tegene's testimony that she was called to the shelter because of "provocative statements that were made.") Ms. Tegene was "not able

---

[10] An FD 12 is an application for emergency hospitalization. *See* D.C. Code § 21-521.

to de-escalate." Additionally, D.D. had bruising and swelling on her face but refused to let emergency medical personnel examine her. All of this led Ms. Tegene to complete an FD 12. Upon arrival at the Comprehensive Psychiatric Emergency Program, D.D. remained agitated, and medical personnel registered her blood pressure as "very high." From there, she was redirected to a hospital and admitted.

D.D.'s second emergency hospitalization, from July 10 to November 25, 2019, followed an FD 12 completed by another CRT member, Patrick Awosika, on June 8, 2019. Responding to a call from Amtrak police, Mr. Awosika reported to Union Station, where he found D.D. lying in front of the building entrance, "yelling, cussing people out, calling them all kinds of names: bitch, motherfucker, I'll fuck you, all kinds of things." He introduced himself to D.D. and offered assistance, but she refused, "calling [the CRT members] all kinds of name[s]" and exhibiting "bizarre behavior." Mr. Awosika wrote the FD 12 in part because of his fear that by calling people "all kinds of names," D.D. might put herself in danger of retaliation. He observed that some passersby at Union Station who encountered D.D. during this episode "tried to call her names back."

D.D.'s third emergency hospitalization initiated by DBH began on December 26, 2019, following an FD 12 on December 10, 2019. Staff at the shelter, to which D.D. had returned after leaving the hospital, called emergency

medical services because D.D. was complaining of a headache and body pain. Emergency personnel found her disorganized, confused, and unable to "talk much." They wrote in the FD 12 that "she was not really able to care [for] herself" and "was deemed vulnerable . . . to be attacked by others."

In D.D.'s case, her counsel raised the possibility that some or all of her symptoms could stem not from her diagnosed psychiatric condition, but rather from a neurological or neurocognitive disorder. The testimony established that after an initial examination (which was limited because D.D. was unwilling to cooperate), the Hospital's neuropsychiatric team sought to do further testing to investigate possible neurological or neurocognitive contributions to her condition.

On cross-examination, Dr. Zaidi concurred that some of D.D.'s symptoms, including insensitivity to social standards and behavior "out of [the] acceptable social range," may sometimes indicate such a neurological or neurocognitive disorder. He agreed that certain dementias are associated with both memory issues and paranoia, but said that memory issues do not "give you . . . delusion[s]." Dr. Zaidi also agreed that patients with some neurological or neurocognitive conditions, such as Alzheimer's disease, Parkinson's disease, and dementia, may present with memory issues along with some symptoms also associated with

schizoaffective disorder. He acknowledged that it would be "important" to rule out such a condition where symptoms overlap with those of a diagnosed illness.[11]

At the end of the bench trial, the court determined that the government had proven, by clear and convincing evidence, the requirements for civil commitment. The trial court concluded that D.D.'s mental illness put her at risk of injuring herself, i.e., that she was "a danger to herself because she puts herself in harm's way by the name-calling and her aggressive and hostile behavior towards others[,] . . . [which] would very likely induce violence and retaliation by others." The court was also persuaded by Dr. Zaidi's testimony that, if discharged, D.D. would stop taking her psychotropic medication, which would cause her to become disorganized, resulting in an inability to take her prescribed hypertension medication and putting her at risk of heart attack or stroke. The court further found that there was no less restrictive treatment available than involuntary inpatient commitment.

---

[11] D.D.'s counsel pressed Dr. Zaidi on the Hospital's failure to have her tested for a neurological or neurocognitive disorder despite his acknowledgment that it would be "important" to rule out such a condition where symptoms overlap with those of a diagnosed illness. Counsel highlighted Dr. Zaidi's statement that, although he interacted with D.D. almost every day, he had not been able to complete a full examination of her due to her "yelling" and "threatening" him. Dr. Zaidi affirmed his confidence in the schizoaffective disorder diagnosis, explaining that evidence of a differential diagnosis (i.e., evidence of other possible conditions that could share the same symptoms) does not remove a primary diagnosis in the absence of testing that negates the primary diagnosis.

## II.  The Applicable Legal Standards

## A.  The Statutory Requirements for Commitment

The District of Columbia's involuntary civil commitment statute is a part of the "Hospitalization of Persons with Mental Illness Act," D.C. Code §§ 21-501 to 21-592, often called the "Ervin Act," *see, e.g.*, *In re Macklin*, 286 A.3d 547, 550 (D.C. 2022); *Tilley v. United States*, 238 A.3d 961, 965 (D.C. 2020).  In order to involuntarily commit an individual, the government must demonstrate that (1) "the person is mentally ill," (2) "because of that mental illness, [she] is likely to injure h[er]self or others if not committed," and (3) there is no "[less] restrictive alternative [to commitment] consistent with the best interests of the person and the public."  § 21-545(b)(2).  The showing on the first two prongs must be made by clear and convincing evidence.  *In re Gaskins*, 265 A.3d 997, 1001 (D.C. 2021) (citing *Addington v. Texas*, 441 U.S. 418, 425-26 (1979) (holding that because of the liberty interests at stake, there must be clear and convincing evidence to order an involuntary civil commitment)); *In re Gaither*, 626 A.2d 920, 925 (D.C. 1993) ("[A]t the disposition stage the trial court need not apply the clear and convincing evidence standard in determining the least restrictive form of treatment" because "[t]hat standard is applicable only at an earlier stage of a civil commitment proceeding, when the hospital must prove that the person for whom commitment is sought is mentally ill and likely to injure self or others." (citation omitted)).  The

clear-and-convincing standard requires that the truth of the factual contentions supporting commitment be "'highly probable' or substantially more likely to be true than untrue." *Gaskins*, 265 A.3d at 1002 (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).

As to the statutory requirement that the court "order the form of commitment it believes is the least restrictive alternative consistent with the best interests of the person and the public," *In re Lanier*, 905 A.2d 278, 284 (D.C. 2006) (quoting D.C. Code § 21-545(b)(2)), we will not disturb the trial court's determination unless it was "plainly wrong or without evidence to support it," *id.* (quoting D.C. Code § 17-305(a)); *see also In re Artis*, 615 A.2d 1148, 1153 (D.C. 1992).

## B. Standard of Review

D.D. challenges the sufficiency of the evidence in support of the trial court's order. Our standard of review for such challenges is "well settled." *In re Perruso*, 896 A.2d 255, 259 (D.C. 2006).

> In examining a claim of insufficiency, the applicable standard of review is whether there is any substantial evidence which will support the conclusion reached by the trier of fact below. This court must view the evidence in the light most favorable to the government and give full weight to the factfinder's ability to weigh the evidence, determine the credibility of witnesses, and draw justifiable inferences. When a case is heard by a judge sitting without a jury . . . the judgment will not be overturned unless it appears that the judgment is plainly wrong or without evidence to support it.

*Gaskins*, 265 A.3d at 1001 (alteration in original) (citations and internal quotation marks omitted) (first quoting *In re Artis*, 615 A.2d at 1152; and then quoting *Perruso*, 896 A.2d at 259).

### III. Analysis

To commit a mentally deficient person under the Act, it is necessary for the government to prove, first, "that the individual involved suffers from a mental illness." *In re Alexander*, 372 F.2d 925, 927 (D.C. Cir. 1967). As noted above, although witnesses testified that D.D. does not believe she has a mental illness and although at trial D.D. challenged the diagnosis of schizoaffective disorder bipolar type, her briefs do not deny that she suffers from a mental illness. In light of Dr. Zaidi's testimony about her diagnosis of schizoaffective disorder bipolar type, we discern no reason to question the sufficiency of the basis for the trial court's finding that D.D. suffers from a mental illness.[12]

Focusing on the second prong of the Ervin Act test ("because of that mental illness, [she] is likely to injure h[er]self or others if not committed," D.C. Code § 21-545(b)(2)), D.D. argues, however, that the government failed to present sufficient evidence to prove that D.D. is likely to injure herself by provoking

---

[12] *Cf. Perruso*, 896 A.2d at 261 ("The court was certainly entitled to rely on the [psychiatrist's] opinion [about whether the individual is mentally ill] in making its ruling.").

retaliation from others who may be targets of her name-calling and vulgarities. Because of other aspects of the record (discussed *infra*) that we find dispositive, we need not decide whether the evidence supported a finding by clear and convincing evidence that D.D. was a danger to herself because of her conduct that might trigger retaliation. Nor, for the same reason, need we resolve whether substantial evidence supported the trial court's finding that D.D. would be a danger to herself if discharged from the Hospital because she would refuse psychotropic medication, become confused and disorganized, and therefore fail to take medication for her "dangerous[ly]" high blood pressure and put herself at risk of heart attack or stroke.[13]  What we find dispositive is the record as it relates to the

---

[13] We do acknowledge that the risk related to D.D.'s hypertension is somewhat attenuated; that her trial counsel's cross-examinations raised questions about whether her inpatient hospitalization and agitation in response to involuntary injections is a principal trigger for her blood pressure spikes; and that the District's theory of injury to herself perhaps tests the boundaries of what counts as an "injury" as contemplated by the statute.  To be sure, we have found in other cases that a person's medical risks supported findings that the person's mental illness put her at risk of injuring herself.  *See, e.g.*, *In re Artis*, 615 A.2d at 1149-50, 1152 (concluding that the evidence was "ampl[e]" to support the decision that Ms. Artis was likely to injure herself if not hospitalized where it showed, inter alia, that she "refused to maintain a diet necessary to control her elevated blood pressure and diabetes" and "refused to self-administer her [needed daily regimen of] prescribed insulin despite several attempts at instruction by hospital staff"); *id*. at 1151 n.1 ("It is *precisely* the union of mental illness with the inability of a person to adequately care for herself that raises the inference of 'danger' and 'injury' to self and triggers the statutory provisions."); *In re Gahan*, 531 A.2d 661, 665 (D.C. 1987) (finding ample evidence to support commitment where the government showed that "if permitted to remain at liberty, Gahan would be a danger to herself," specifically by

statutory requirement that there be no "[less] restrictive alternative [to commitment] consistent with the best interests of the person and the public." D.C. Code § 21-545(b)(2). On the record before us, we are persuaded that the trial court's findings as to this requirement were not supported by substantial evidence.

The record raises more than uninformed speculation that D.D.'s danger-productive outbursts could be the result of a neurological condition such as dementia rather than the result of her diagnosed psychiatric condition. As described above, the Hospital's neuropsychiatric team recommended further testing to investigate possible neurological or neurocognitive contributions to D.D.'s condition. They opined after a limited examination of D.D. that "in addition to the psychiatric issues, it's a possibility . . . that she might have some single neurological event, or some neuropsychiatric even[t]." As also described above, Dr. Zaidi concurred that some of D.D.'s symptoms, such as her insensitivity to social standards, could indicate such a neurological or neurocognitive disorder. Further, he agreed that patients with some neurological or neurocognitive conditions, such as Alzheimer's disease, Parkinson's disease, and dementia, may have symptoms like those caused by schizoaffective disorder, including irritability

---

"not eating and . . . becoming severely dehydrated," triggering "numerous other medical problems that can come from that"). We need not decide, however, whether D.D.'s medical risk is distinguishable from the risks at issue in those cases.

and agitation. And he acknowledged that it would be "important" to rule out such a neurological/neurocognitive condition.

Given the foregoing testimony, we are concerned about the timeline: Dr. Zaidi's testimony on June 1, 2022, that D.D. was scheduled for an MRI (part of the recommended further testing) the day after his testimony, followed by a representation by D.D.'s counsel on June 8, 2022 (immediately after the court stated that it would grant the government's petition), that the results of the MRI were "abnormal" but had not yet been interpreted by or discussed with neurologists. In light of the trial court's having received those signals of a possibility that additional relevant evidence would soon become available, we are unable to uphold the court's adherence to its decision to order D.D.'s inpatient commitment without waiting for an explanation of the test results (which might have suggested that a memory care or dementia facility, for example, could meet D.D.'s needs).[14]

A second, related basis for reversal is this: insofar as the trial court's order authorized inpatient commitment of D.D., the record does not support that inpatient commitment was the least restrictive alternative consistent with the best

---

[14] We recognize that D.D.'s counsel explicitly lodged no objection to proceeding to disposition on June 8, but we conclude that the trial court's finalizing its inpatient commitment ruling without awaiting a fuller explanation of the MRI results was a plainly erroneous exercise of discretion.

interests of D.D. and the public. The government's petition for inpatient commitment was based almost entirely on the need for D.D. to receive involuntary injections of her current psychotropic medication. Dr. Zaidi confirmed that he had initially recommended her commitment to outpatient treatment, but modified his position because he had come to understand that there was "no mechanism to involuntarily administer [Ms.] D. her psychotropic medication if she is discharged into the community." But Dr. Zaidi did not "know for sure" whether a nursing home, for example, would be able to administer involuntary injections, and he "just guess[ed]" that a nursing home would not have the number of staff available to restrain D.D. if she were to physically resist treatment. He agreed that "it could be explored" whether a memory care or dementia unit would be able to administer involuntary medications.

"[I]t is the *state's* burden to demonstrate the existence and unsuitability of various treatment alternatives, not respondent's, and it is the trial court's responsibility to ensure that the state meets this burden." *In re Stokes*, 546 A.2d 356, 361 (D.C. 1988) (emphasizing that the trial court must play a "role . . . in searching for treatment alternatives"). Here, neither the District's nor the trial court's exploration of possible alternatives to inpatient hospitalization for D.D. appears to have been particularly searching. We acknowledge that some evidence was presented about the possible non-viability of certain alternatives. A

representative of one provider of "the most intensive outpatient services available in the District" testified to the effect that her organization could not perform involuntary injections.  Ms. Bassil testified that D.D. has refused to discuss being discharged to group housing or to a long-term-care or assisted living facility, and D.D. herself told the court that the suggestion that she be placed in a nursing home was "appalling."  Further, Dr. Zaidi explained that in light of COVID-19, bringing D.D. to the Hospital for injections might not be feasible.  But, as we have emphasized before, "[t]he statutory scheme in this jurisdiction does not limit the court in a commitment proceeding to a polarized choice between indefinite hospitalization and unconditional release: it makes the entire spectrum of services . . . available, including outpatient treatment, foster care, halfway houses, day hospitals, nursing homes, and others."  *Id.* at 360 (alterations in original) (internal quotation marks omitted) (quoting *In re Mills*, 467 A.2d 971, 974-75 (D.C. 1983).[15]    The government did not show why one of those (or other)

---

[15] *See also In re Plummer*, 608 A.2d 741, 749 (D.C. 1992) (Rogers, C.J., concurring) (explaining that the statutory scheme "has been construed to impose a duty upon the courts to explore alternatives both *within* the mental hospital . . . and *outside* the hospital, . . . and to require that the courts select the least restrictive alternative which would serve the purposes of the commitment" (alterations in original) (quoting *In re Mills*, 467 A.2d at 974-75)); *cf. Lessard v. Schmidt*, 349 F. Supp. 1078, 1096 (E.D. Wis. 1972) (holding that the Constitution compelled the state to establish the unsuitability of numerous alternatives to involuntary full-time hospitalization before commitment could be ordered, including "voluntary or court-ordered out-patient treatment, day treatment in a hospital, night treatment in

alternatives could not be used in conjunction with, as necessary, administration of

D.D.'s injectable psychotropic medication by Hospital staff.[16]  *See id.* at 363-64

(observing, in vacating inpatient commitment order, that a dual-diagnosis program

specifically tailored to Stokes's needs, which had already resulted in her making

improvements, had not been made available to her prior to initiation of the

a hospital, placement in the custody of a friend or relative, placement in a nursing home, referral to a community mental health clinic, and home health aide services"), *vacated and remanded on other grounds*, 414 U.S. 473 (1974).

[16] In its January 25, 2022, Report and Recommendation to the trial court, the Commission on Mental Health (the "Commission") referred to D.D.'s "potential [d]ementia" and also noted Dr. Zaidi's testimony before the Commission stating that it was not clear that D.D. has dementia but "acknowledg[ing] that elderly patients who have [d]ementia have increased risks on [D.D.'s prescribed] medication."  The Commission recommended, in a bolded and underscored passage, "[t]hat the [trial court] order D.D.to undergo a medication review . . . to determine if another medication regime can better address her symptoms and risk of side effects, given her diagnosed and potential neurological conditions," and added that the review would "explore whether other medications could improve her condition and enable her safe outplacement to the community."

    We recognize that in determining its recommendations, the Commission is not subject to a clear-and-convincing-evidence or other standard-of-proof requirement.  *See In re Holmes*, 422 A.2d 969, 971 (D.C. 1980).  We also recognize that, unlike in cases where the person whose commitment is recommended has not made a timely demand for a trial, the statute does not contemplate that the trial court's decision is to be made "on the basis of the report of the Commission, or on such further evidence in addition to the report as the court requires."  D.C. Code § 21-545(a).  We therefore cite the Commission's report (which, at oral argument, was analogized to a charging document) not as evidence, but only as context for our observation that no evidence of a medication review was presented at trial.

proceeding to revoke her outpatient status, and that her doctor did not explain why she "could not remain as an outpatient temporarily in lieu of indefinite inpatient status").

## IV. Conclusion

A commitment order necessarily authorizes a substantial deprivation of liberty and, accordingly, the government must justify the extent of that deprivation with sufficient evidence. On the record before us, the government failed to meet its burden of showing that inpatient commitment is necessary for D.D. to receive appropriate treatment. Accordingly, we vacate the order of the Superior Court ordering inpatient commitment.[17]

*So ordered.*

---

[17] The District filed a supplementary appendix that contains (in addition to some documents that were already part of the record) documents relating to D.D.'s 2020 commitment trial and February 14, 2020, Commission recommendation, and portions of the District's brief cite those extra-record materials. D.D. has moved to strike the supplemental appendix and brief. Because we have resolved the issues presented without referring to or relying on those materials, we now deny as moot both the motion to supplement the record and the motion to strike.